### In re YARN PROCESSING PATENT VALIDITY LITIGATION.

### CELANESE CORPORATION and Fiber Industries, Inc., Plaintiffs-Appellees,

v.

### LEESONA CORPORATION et al., Defendants,

### Lex Tex Ltd., Inc., Defendant-Appellant.

### No. 74–3703.

United States Court of Appeals, Fifth Circuit.

April 19, 1976.

Rehearing Denied Aug. 4, 1976.
See 536 F.2d 1025.

James L. Armstrong, III, Miami, Fla., for defendant-appellant.

Charles A. Kimbrell, Miami, Fla., for plaintiffs-appellees.

Before GOLDBERG and AINSWORTH, Circuit Judges, and NICHOLS,* Associate Judge.

NICHOLS, Associate Judge:

## STATEMENT OF THE CASE

This attorney conflict of interest case arises as part of a complex patent and anti-trust controversy involving 51 lawsuits. The cases have been consolidated for pre-trial proceedings in the Southern District of Florida. *In re Yarn Processing Patent Validity Litigation,* 341 F.Supp. 376 (Jud.Pan.Mult.Lit.1972). Though the appeal is not from a final judgment in the traditional sense, we take jurisdiction of it as a collateral matter severable from the underlying suit, and too important to be denied review at this time. *See, Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); *United States v. Garcia,* 517 F.2d 272, 275 (5th Cir. 1975). For the purposes of this case it will be sufficient to identify only the principal parties concerned and their interest in the underlying litigation.

Lex Tex Corporation is the owner of three patents involving the processing of synthetic yarn. These patents cover the "double heater" false twist process, which is more sophisticated than the "single heater" false twist process for which three patents are held by Leesona Corporation, a closely allied company to Lex Tex or working in concert with it. All of the "single heater" patents and all but one of the "double heater" patents owe their existence to the research efforts of Nicholas J. Stoddard and Warren A. Seem, two inventors who formed Permatwist and sold their inventions to Leesona through that partnership. Leesona has subsequently transferred its interest in the "double heater" technology to Lex Tex. Lex Tex obtained the other "double heater" patent (hereinafter referred to as the "011" patent) through a British concern, Ernest Scragg & Sons, Ltd. Lex Tex pays Scragg a portion of the royalties it collects for the use of all the "double heater" patents. In addition, Scragg is one of several manufacturers of the machines using the false twist processes.

Leesona and Lex Tex license, on a royalty-free basis, the machine manufacturers to manufacture and sell the production machines which implement the false twist process. The manufacturers are required to sell only to licensed throwsters, *i. e.,* manufacturers of synthetic yarn, who pay Leesona or Lex Tex a use royalty computed on the basis of the

---

* Of the U.S. Court of Claims, sitting by designation.

amount of fabric produced. Machine manufacturers receive or have received a portion of the use royalties which are collected by Lex Tex and Leesona for the use of the machines produced by the particular manufacturer.

Following the abolition of the patent licensee estoppel doctrine by the Supreme Court decision in *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), throwsters originally brought this litigation against Leesona, Lex Tex and Permatwist. The suits allege patent invalidity, patent misuse and anti-trust violations. In addition to judicial declarations of patent unenforceability, the suits seek treble damages. Leesona and Lex Tex have counter-claimed for patent infringement, and they seek payment of royalties under the license agreements. Leesona also has counter-claimed against Burlington Industries and Celanese Corporation, the dominant thowsters, alleging monopolization of the false twist yarn texturizing industry and conspiracy to restrain entry into that industry.

Edward S. Irons, Esquire, and his law firm, Irons & Sears, now represent Celanese Corporation and its subsidiary, Fiber Industries, Inc. (Hereinafter collectively referred to as Celanese/F. I. I.). The alleged conflict of interest arises because several years ago Scragg retained various law firms with which Mr. Irons was at the time a senior partner, for the purpose of advice regarding the validity of the "single heater" patents held by Leesona. Scragg later became a party defendant in the instant litigation and made a motion to disqualify Mr. Irons. Celanese/F. I. I. was the only party which had joined Scragg as a defendant. Following argument on the motion, Celanese dismissed its complaint against Scragg without prejudice. Several months thereafter Lex Tex moved to disqualify Irons. After argument, Judge C. Clyde Atkins denied the Lex Tex motion on the grounds that Lex Tex has no standing to raise the question. Lex Tex has appealed this decision, and finding ourselves in substantial agreement with Judge Atkins, we affirm.

## THE RELATIONSHIP BETWEEN SCRAGG AND THE IRONS LAW FIRMS

According to the allegations of the Scragg motion to disqualify Irons, the law firm of Burns, Doane, Benedict & Irons began its relationship with Scragg in late 1957. This firm changed its name and membership several times during the relevant periods but Mr. Irons remained connected. We assume, for purposes of this decision, so long as Mr. Irons was a member, his personal role in handling Scragg's business is irrelevant and need not be considered. Therefore, we can and do refer to each firm just as the "Irons firm". During 1957 and 1958 the Irons firm advised Scragg on the validity of the "single heater" patents owned by Leesona, which was then known as Universal Winding. About this time Ernest Philip Rushton Scragg filed the predecessor application in the British patent office covering the "double heater" false twist technology now covered by the "011" patent issued to Mr. Scragg in the United States. Scragg was concerned that utilization of the "double heater" technology might infringe the "single heater" patents owned by Universal Winding. The purpose of the advice related to the advisability of a declaratory judgment action to be brought against Universal Winding on the issue of the validity of the "single heater" patents and on the issue of whether they were infringed by Scragg. It should be noted that nowhere is it alleged or shown in incorporated motion papers that Irons was personally involved in any way with the matters concerning Scragg. However, it is clear that during the 1957–58 period and subsequent periods, technical information was imparted to Irons' former partners by Scragg and its British patent agent.

Although Scragg filed no suit immediately resulting from the advice of the Irons firm given in 1957–58, it is clear that Scragg maintained an adverse inter-

est in relation to the continued validity of the "single heater" patents for a considerable period of time. During September 1959, Scragg became a party defendant in a United States District Court infringement suit brought by Universal Winding against Southern Silk Mills, a licensee of Scragg. Scragg had a "hold harmless" clause in the agreement with Southern Silk. Scragg was eventually dismissed as a party in that case approximately one year later. However, Scragg continued to retain counsel with respect to the litigation. Originally, Scragg retained a law firm with which Mr. Irons was not associated. However, in early 1962, Scragg substituted an Irons law firm. The original firm sent the Irons firm all the relevant files. The Irons firm used the files to aid Southern Silk in the defense of the lawsuit.

Mr. Irons represented to the Court below—and no one disputed—that Scragg settled with Leesona the "single heater" patent infringement and validity issues under American law in line with the outcome of another suit brought by Scragg in Canada, which resulted in an unreported decision for Leesona/Universal Winding, filed February 28, 1964. *See: In re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 275–77 (5th Cir. 1974). Mr. Irons asserted that this firm had nothing to do with this settlement, and there is no assertion of any further attorney-client relationship with Scragg. By November 1965, Scragg accepted a Leesona license under the United States and Canadian "single heater" patents. On June 16, 1971, Scragg assigned the "011" double heater patent to Lex Tex under which Scragg obtains a share of the total royalty income from all the "double heater" patents.

On June 28, 1971, Mr. Irons filed a complaint in the United States District Court for the Southern District of Florida on behalf of Celanese/F. I. I. seeking a declaratory judgment invalidating the Leesona "single heater" patents and the Lex Tex "double heater" patents (including the "011" patent acquired from Scragg). On September 28, 1972, Mr. Irons filed a complaint in the same court seeking the same relief against Scragg with regard to the "011" patent. According to affidavits filed by Mr. Irons and his partner below, this complaint was filed shortly after Mr. Irons and his partner had attempted to obtain Scragg's voluntary cooperation in furnishing material from its files.

On January 29, 1973, Scragg filed its "Motion to Disqualify Edward S. Irons and the Firm of Irons, Sears & Santorelli, or in the Alternative, to Dismiss Ernest Scragg and Sons, Limited and Scragg of North America, Inc." Shortly after the hearing on the motion but prior to any ruling by the District Court, Celanese/F. I. I. dismissed its suit against Scragg without prejudice on April 10, 1973, under Rule 41(a)(1) of the Federal Rules of Civil Procedure. Scragg did not press the disqualification matter any further.

Lex Tex filed its motion to disqualify Irons and his firm on September 13, 1973. In this motion, Lex Tex did not assert any interest of its own as to which it could assert a conflict of interest. Instead, Lex Tex maintained that the court should have disqualified Irons on its own motion. After argument the District Court announced on November 2, 1973, that it would deny the Lex Tex motion on the ground that Lex Tex lacked standing.

### SCRAGG'S INTEREST IN THIS LITIGATION

There can be no doubt that at the time Scragg filed its motion to disqualify Irons, that Scragg's interests were adverse to Celanese insofar as Scragg was formally joined as an adverse party. *Harvey v. Harvey,* 231 N.W. 580, 582 (Wis.1930). However, the Lex Tex motion to disqualify Mr. Irons, which is the subject of the instant appeal, was made only after Scragg was dismissed from the case, albeit without prejudice. (Although Lex Tex makes much of the possibility that Scragg might be sued again, after the dismissal, Scragg is in no worse

position than if the complaint against it had never been filed.) One difficulty we have with Lex Tex's position, namely that Mr. Irons should be disqualified by the court as a matter of public policy, is that we are not shown that Scragg's interests are presently adverse to those of Mr. Irons' present clients.

The history of Scragg's relationship to Leesona and Lex Tex as well as the surrounding circumstances of this litigation fails to resolve our uncertainty concerning whether Scragg's interests are presently adverse to the throwsters. During the entire period that Scragg retained the various Irons' law firms, it maintained the position that the single heater patents owned by Leesona were invalid, unenforceable and not infringed by its double heater process. It was only after the loss of a major court battle against Leesona in the Canadian case that Scragg appeared to decide that if it couldn't beat Leesona it would join it. Lex Tex argues that Scragg has a stake in the maintenance of its present licensing arrangement with Lex Tex. Although there may be some profitability for Scragg in the present arrangement, it is for Scragg and not for Lex Tex or ourselves to decide whether Scragg should be satisfied with it or seek to arrange something better when and if the present licensing system should be declared invalid. It is possible that Scragg would place greater value on the ability to compete freely with Lex Tex and Leesona than on its interest in the patent pool. The question of where the interest of Scragg lies in this litigation is a matter for Scragg to determine in the exercise of its independent legal and business judgment. Until Scragg should manifest its intentions in this regard, we cannot determine whether a conflict exists.

■ Scragg's course of conduct before the District Court led Judge Atkins to believe that the thrust of Scragg's objections to the continued appearance of Mr. Irons concerned only his appearance in the case against Scragg:

* * * here, the only real party in interest, Scragg elected to be satisfied with a dismissal from the lawsuit after originally challenging its former counsel's representation. (Order of August 29, 1974, MDL Docket No. 82 (S.D. Fla.))

At the hearing of Scragg's motion, Mr. Irons represented without denial by Scragg that some of his former partners in the firm advising Scragg during the 1957–58 period, what we have called the previous "Irons firm," appeared on behalf of other throwsters in their litigation against Leesona and Lex Tex and that Scragg did not object to their appearance. (The record confirms that William W. Beckett was associated with the Irons firm in 1957, when Scragg was being advised by this firm. Mr. Beckett has appeared without objection, on behalf of another throwster, Sauquoit Fibers Company.) Scragg's motion was made to disqualify Mr. Irons and his firm or, in the alternative, to have itself dismissed as a party defendant. After Celanese filed the voluntary dismissal, the trial judge quite properly viewed the Scragg motion as moot because Scragg had obtained the full measure of the alternative relief requested. If Scragg viewed its interests threatened by the continued representation of Celanese by Mr. Irons, Scragg could have intervened as of right under Rule 24(a) of the Federal Rules of Civil Procedure, and it could have pressed for the disqualification of Mr. Irons. Its silence in this regard can only be understood as an indication that Scragg does not view its interests threatened by Irons' continued representation of his clients in this case from which Scragg has been dismissed.

### LEX TEX'S STANDING BASED ON SCRAGG'S INTEREST

■ As a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification. *E. F. Hutton & Co. v. Brown,* 305 F.Supp. 371, 377 (S.D.Tex.1969); *Murchison v. Kirby,* 201 F.Supp. 122 (S.D.N.Y.1961); *Davis v.*

*Poelman,* 178 So.2d 306, 311 (La.Ct.App. 1965); *Almon v. American Carloading Corp.,* 312 Ill.App. 225, 38 N.E.2d 362, 364–65 (1941), *rev'd. on other grounds,* 380 Ill. 524, 44 N.E.2d 592 (1942); *Ferguson v. Alexander,* 122 S.W.2d 1079, 1081 (Tex.Civ.App.1938); and *Richardson v. Hamilton International Corp.,* 333 F.Supp. 1049, 1054–55 (E.D.Pa.1971), *aff'd,* 469 F.2d 1382 (3d Cir. 1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). *Fisher Studio v. Loew's, Inc.,* 232 F.2d 199, 204 (2d Cir. 1956), is particularly noteworthy because the Court of Appeals in that case reversed the District Court insofar as it had disqualified attorneys from appearing against parties other than their former clients.

The cases relied upon by Lex Tex present what are, in our view, at most, narrow exceptions to this general rule. In *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir. 1973), the motion to disqualify was made by the corporation which the former client controlled. In *Porter v. Huber,* 68 F.Supp. 132 (W.D.Wash.1946), the inquiry whether counsel had a conflict of interest apparently originated with the court, but the unethical change of sides was manifest and glaring. Such was also the case in *Empire Linotype School, Inc. v. United States,* 143 F.Supp. 627, 631 (S.D.N.Y. 1956), where the court in dictum said it would have had to take action to disqualify counsel even if the adverse party had not moved. And in *Estates Theatres, Inc. v. Columbia Pictures, Inc.,* 345 F.Supp. 93 (S.D.N.Y.1972), the former client appeared by counsel to argue for the disqualification even though he was not the formal moving party. Even though former clients did not formally move for the disqualification, the adverse nature of their interests, relative to the new clients, of their attorneys were open and obvious and confronted the court with a plain duty to act. Such is not the case here.

A former client may consent to the employment of the attorney by an adverse party even where the former client is involved in the case as a party. In *Consolidated Threatres v. Warner Bros. Circuit Management Corp.,* 216 F.2d 920, 926 (2d Cir. 1954), the court explained that this might typically occur where the former client realizes that any prior disclosures will not prejudice him in the new case. Such consent will prevent the disqualification of the attorney even in a criminal case. *United States v. Garcia,* 517 F.2d 272 (5th Cir. 1975).

A former client seeking to disqualify an attorney who appears on behalf of his adversary need only to show that "the matters embraced within the pending suit * * * are substantially related to the matters or cause of action wherein the attorney previously represented him." *T. C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.D.N.Y.1953); *Emle Industries, Inc. v. Patentex, Inc., supra,* at 570. This rule rests upon the presumption that confidences potentially damaging to the client have been disclosed to the attorney during the former period of representation. The court may not even inquire as to whether such disclosures were in fact made or whether the attorney in fact is likely to use the damaging disclosures to the detriment of his former client. *Emle Industries, Inc., supra,* at 571. The former client is also aided by the presumption that any confidences given to the attorney were shared among the attorney's partners and employees associated with the attorney at that time. *American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125, 1129 (5th Cir. 1971). These presumptions would seem necessary to aid the frank exchange between attorney and client by helping to preclude even a possibility that information given in confidence by the former client will be used without the client's consent. Public perception of that possibility will tend to undermine public confidence in the legal profession and the judicial process even if the former client is not in fact damaged.

These considerations do not apply where the former client does not object to the seemingly adverse representation.

The underlying rules relating to attorney conflicts of interest are designed to allay any apprehension a client may have in frank discussion of confidential information with his attorney. Public confidence in the privacy of this discussion should not be impaired where the former client, having every opportunity to do so, fails to object to a new relationship involving his former attorney, and where the unethical nature of the attorney's change of sides is not manifest but would need to be shown.

■ To allow an unauthorized surrogate to champion the rights of the former client would allow that surrogate to use the conflict rules for his own purposes where a genuine conflict might not really exist. It would place in the hands of the unauthorized surrogate powerful presumptions which are inappropriate in his hands. Courts do not generally examine the motives of a moving party in a disqualification motion. Once the preliminary showing is made by the former client, the motion must be granted regardless of whether the former client gains an advantage at the expense of his adversary. *Emle Industries, Inc., supra,* at 574–75. We are reluctant to extend this where the party receiving such an advantage has no right of his own which is invaded.

### LEX TEX'S STANDING BASED ON ITS OWN INTEREST

Lex Tex asserts that as the joint venturer of Scragg and as the assignee of the "011" patent, it has sufficient standing to seek disqualification of the Irons firm:

> As a "partner", "co-venturer" Lex Tex certainly has an obligation to defend attacks against the validity and enforceability of the double heater patents, since its partner, Scragg, stands to benefit from revenues derived from licensing of those patents. On the other hand, when Lex Tex acquired "011 (sic) it had a right to expect that the validity and enforceability of that patent would not be subject to attack

by counsel who had represented Scragg on substantially related subject matter. (Lex Tex Reply Brief at 30.)

In this argument, Lex Tex confuses the nature of the rights and duties implicit in the assignment of the patent with the nature of the rights and duties which arise between an attorney and client.

■ Assignment of the patent does not assign Mr. Irons along with it. The relationship between an attorney and his client is personal. *Boettcher v. Criscione,* 180 Kan. 39, 299 P.2d 806, 811 (1956), *modified,* 180 Kan. 484, 305 P.2d 1055 (1957). As in all relationships of this nature, the rights and duties may not generally be assigned or delegated without the consent of all parties, especially where the assignment or delegation renders the performance more onerous for the party performing, or renders the performance less valuable to the party receiving it. *Corson v. Lewis,* 77 Neb. 446, 109 N.W. 735 (1906), *modified,* 77 Neb. 449, 114 N.W. 281 (1907). *See:* 4 Corbin on Contracts, Sec. 868 (1951).

■ The prohibition applied to attorneys against representation of conflicting interests rests on the duties of an attorney arising from the attorney-client relationship. In the absence of this relationship, the duties of loyalty and confidentiality do not arise. *American Can Co. v. Citrus Feed Co., supra,* at 1128–30. Such a relationship can only be formed with the consent of the attorney and his client. *McGlone v. Lacey,* 288 F.Supp. 662 (D.S.Dak.1968). The attorney-client relationship existed between Scragg, Irons' former partners, and Irons himself by imputation. Lex Tex was not a party to this.

■ When Lex Tex was assigned the "011" patent it thus did not receive assignment of any rights against Mr. Irons. Reading into the assignment agreement between Lex Tex and Scragg a contrary meaning would undermine one purpose of the patent monopoly which is to encourage public disclosure of useful technological information. *Sinclair Co. v. Interchemical Corp.,* 325 U.S.

327, 331, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644, 1647 (1954). Scragg remained free to conceal the information in its files or to disseminate it to anyone it sees fit. The files and information turned over to Irons' partners remained the property of Scragg.

The order entered by Judge C. Clyde Atkins on August 2, 1974, denying the Lex Tex motion to disqualify the firm of Irons, Sears & Santorelli, is affirmed.

AFFIRMED.