**In re PACIFIC HOMES, a California Non-Profit Corporation, also dba Asbury Pharmacy, Claremont Manor, Casa De Manana, Desert Crest, Fredericka Manor, Kingsley Manor, Pohai Nani, Wesley Palms, Sparr Convalescent Hospital, and La Jolla Convalescent Hospital, Debtor.**

**Richard E. MATTHEWS, Trustee for the Estate of Pacific Homes, a California Non-Profit Corporation, Plaintiff,**

v.

**The PACIFIC & SOUTHWEST ANNUAL CONFERENCE OF the UNITED METHODIST CHURCH, a California Non-Profit Corporation, Defendant.**

**Bankruptcy No. 77–01667–JM "B".**

United States Bankruptcy Court, C. D. California.

Dec. 5, 1979.

See also, D.C., 456 F.Supp. 851.

Richard M. Neiter and Isaac M. Pachulski, of Stutman, Treister & Glatt Professional Corp., Los Angeles, Cal., Sp. Counsel to the Trustee, for the Trustee (plaintiff).

William McD. Miller, III, and Charles E. Wiggins, of Musick, Peeler & Garrett, Los Angeles, Cal., for defendant.

MEMORANDUM OF DECISION ON MOTION TO DISQUALIFY MUSICK, PEELER & GARRETT AS COUNSEL FOR THE PACIFIC & SOUTHWEST ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH; AND CERTIFICATE OF MAILING THEREON

JAMES E. MORIARTY, Bankruptcy Judge.

This debtor proceeding was filed on February 18, 1977, under Chapter XI of the Bankruptcy Act. On the date of filing, this Court entered an Order authorizing the debtor to continue the operation of the several retirement homes and medical facilities as Debtor in Possession. On March 2, 1977, an Order was entered employing the law firm of Musick, Peeler & Garrett (Musick) as counsel for the debtor. This Order included the employment of Francis F. Quittner who was of counsel to the Musick firm. On November 8, 1977, Richard E. Matthews was appointed Receiver in the Chapter XI proceeding. On November 9, 1977, the

debtor filed a motion to convert the Chapter XI to a Chapter X proceeding. On December 9, 1977, the Honorable A. Andrew Hauk, United States District Judge, referred all proceedings under Chapter X of the Bankruptcy Act to the undersigned as Bankruptcy Judge. By Order entered on December 9, 1977, Richard E. Matthews was appointed Trustee in the Chapter X proceedings.

On December 9, 1977, the Trustee filed an application to employ the law firm of Kadison, Pfaelzer, Woodard, Quinn & Rossi as General Counsel, and an application to employ the law firm of Stutman, Treister & Glatt as Special Counsel. Both applications were approved on December 9, 1977. The Kadison firm had no prior association with the debtor, or any creditors. The Stutman firm had previously represented unsecured trade creditors in an informal creditors' arrangement in 1976 under the auspices of the Creditor Managers' Association of Southern California (CMA) and represented the Official Unsecured Trade Creditors' Committee in the Chapter XI proceeding. The Official Unsecured Trade Creditors' Committee is now represented by Earle Hagen, Esquire. The resident creditors formed a committee in this Chapter X proceeding and employed the law firm of O'Melveny & Myers as their legal representative pursuant to an Order of this Court. Because of the expertise of the Stutman firm in the field of bankruptcy, this firm was employed to handle those matters where their expertise would be most helpful to the trustee.

By Order of this Court entered on December 13, 1977, Rolan Maxwell was substituted and replaced Musick, Peeler & Garrett as counsel for Pacific Homes.

For sometime prior to 1976, the Musick firm had represented the Pacific and Southwest Annual Conference of the United Methodist Church (Annual Conference). In January of 1976, the Musick firm, at the request of the Annual Conference, undertook the legal representation of Pacific Homes. At that time, the financial condition of Pacific Homes had reached a critical stage.

In February, 1976, Pacific Homes called an informal meeting of its general trade creditors under the auspices of CMA. As the result of this informal proceeding, the debtor reached an agreement for deferred payments with its trade creditors. The funds needed to fund this informal arrangement and for future operating expenses were obtained by a loan from Mutual Benefit Life Insurance Company in the sum of $6 Million. To procure this loan, Pacific Homes gave to Mutual Benefit a trust deed on certain of its then owned real property. By September, 1976, the sum of $4.2 Million remained from this loan. Within a few months after the filing of the Chapter XI proceeding on February 18, 1977, this entire sum had been expended without any real or lasting benefit to this debtor estate, the residents, or secured creditors. Indeed, the long-term debt had been increased from $16 Million to $22 Million, with no demonstrable ability to service this debt.

As the hearings under Chapter XI proceeded, the Court became aware of the many problems the debtor faced. Counsel from the Musick firm did not seem to understand the efforts necessary to confirm an arrangement under Chapter XI. This was not true of Mr. Quittner whose reputation in the field of bankruptcy is well recognized. It soon became apparent to the Court that Mr. Quittner had only a limited participation in this proceeding.

A Chapter XI proceeding deals primarily with the debts owed to unsecured creditors. However, anyone who has any experience in Chapter XI matters is fully aware that in order to put together a successful Plan of Arrangement some understanding with their secured creditors is necessary. It is quite common for the Receiver or Debtor to meet with the various classes of creditors to work out the many problems necessary before a Plan can be formulated. For reasons unknown to this Court, counsel for the debtor appeared reluctant to meet with the several creditor groups. If any agreement was ever reached with any of the secured creditors, the Court was not so advised.

The Court believes that no written agreements with secured creditors were ever consummated.

Since the enactment of the Bankruptcy Act of 1898, creditors have had, pursuant to Section 21a of the Bankruptcy Act (11 U.S.C. 44), the right to examine the debtor, its officers, former officers, and employees. This examination is now conducted under Rule 205(a) of the Rules of Bankruptcy Procedure. The purpose of such an examination is to ascertain the cause of the debtor's financial problems. From this type of examination, it can be learned how to restructure the revitalized debtor to avoid financial problems in the future and to disclose any possible legal action the debtor may have against any officer, employee, or third person.

On May 12, 1977, the Attorney General of the State of California representing the Department of Social Services and the Office of Statewide Health Planning & Development filed applications to conduct 205(a) examinations of two former officers of Pacific Homes. Hearings were scheduled on May 20, 1977. Leonard E. Castro, Esquire, of the Musick firm, expressed strong opposition to the conduct of these examinations. The hearings went forward, but the atmosphere was hardly conducive to a fair discovery of many of the events that occurred in the management of Pacific Homes prior to the filing of this proceeding.

The One Hundred Twenty-Seventh Annual Session of the Pacific and Southwest Annual Conference of The United Methodist Church was held on June 11–15, 1977, at the University of Redlands, Redlands, California. The Court was advised that a number of resolutions were approved relating to financial aid by the Annual Conference to Pacific Homes.

The key resolution provided for the contribution of an amount not to exceed $9 Million for the period between April 1, 1977, and March 31, 1986, on the condition that " . . . a Plan of Arrangement acceptable to all parties to the Pacific Homes Chapter XI proceeding, including the Annual Conference, be confirmed by the Bankruptcy Court on or before December 1, 1977."

Of the $9 Million, the sum of approximately $1.2 Million was to be made available to Pacific Homes for the period between July 15, 1977, and December 1, 1977.

The above is set forth for the reason that since the Musick firm was counsel for the Annual Conference and also counsel for Pacific Homes at that time, it is reasonable to believe that these resolutions were either prepared by the Musick firm or met with their approval before they were acted upon.

Further, it appears that some of the language in the several resolutions was set forth without regard to the provisions of the Bankruptcy Act. Section 362(1) (11 U.S.C. 762(1)) provides as follows for the approval of a Plan of Arrangement:

"(1) it has been accepted in writing by a majority in number of all creditors or, if the creditors are divided into classes, by a majority in number of all creditors of each class, affected by the arrangement, whose claims have been proved and allowed before the conclusion of the meeting, which number shall represent a majority in amount of such claims generally or of each class of claims, as the case may be;"

This Court, during the past seventeen years, has handled a number of large Chapter cases and does not recall a single large case in which every creditor voted to accept the Plan.

Originally, the Plan of Arrangement was to be filed on September 2, 1977. It was finally filed on September 27, 1977. Hearing on the Plan was set for November 4, 1977. As noted on page 2 hereof, the conversion of this proceeding from a Chapter XI to Chapter X of the Bankruptcy Act was approved on December 9, 1977, when the Honorable A. Andrew Hauk entered an Order referring all matters under Chapter X to the undersigned as Bankruptcy Judge.

After the filing of the Plan on September 27, 1977, there were a number of individual creditors who filed Complaints to Determine Dischargeability pursuant to Section

17 of the Bankruptcy Act (11 U.S.C. 35). On October 17, 1977, there were 144 complaints to determine dischargeability filed on behalf of residents of Pacific Homes by one law firm. The filing of the many complaints to determine dischargeability practically doomed the Plan of Arrangement, since the Court could not possibly dispose of these matters and approve the Plan by the December 1, 1977, deadline. The question of feasibility was a serious problem. The cost of carrying the long-term debt with interest of approximately $2 Million a year, not counting any payments on the principal, even if delayed for a year, would have created an impossible drain on the cash flow of the debtor.

The Musick firm, in setting forth the classification of creditors in the Plan of Arrangement, made provisions for the payment of the cost of administration to be paid in cash upon confirmation of the Plan. Two of the five secured creditors with recorded liens, State of California and Pacific Methodist Investment Fund (PMIF), were not to be affected by the Plan, meaning they were to be paid in full upon confirmation of the Plan. PMIF is an agency created and controlled by the Annual Conference to market certain debentures issued by Pacific Homes. The State of California held two separate liens against the properties of Pacific Homes. The first lien arose out of a loan of approximately $750,000 advanced by the State of California to Pacific Homes to carry out certain improvements to the California properties to bring them within the Code provisions relating to the safety requirements of each operating facility.

The second lien asserted by the State of California came into being when the Department of Social Services filed a lien on behalf of all the residents in the California facilities.

The Court is sure that under the provisions of the Plan the obligation on which liens were held by the State of California related only to the funds borrowed by Pacific Homes to make the installation of safety features required by the building code.

The claims of the residents were designated as Class 1. Under the General Provisions of the Plan, confirmation of the Plan was expressly conditioned upon a number of events happening, including (1) acceptance by ninety-three (93%) percent of the residents or such lesser percentage as the debtor may accept; and (2) the Annual Conference shall have consented to the Plan and become obligated to pay the balance of the $9 Million due by 1986.

In light of the several provisions of the Bankruptcy Act, the Court is not sure what counsel for Pacific Homes were trying to accomplish. The Court has reviewed the Plan several times and has sometimes wondered whether the debtor was Pacific Homes or the Annual Conference. In analyzing this entire approach to the Plan of Arrangement, one could conclude that the Musick firm was more interested in protecting the Annual Conference than reestablishing Pacific Homes as a viable entity. In any event, the Annual Conference was relieved of contributing approximately $7.5 Million of the $9 Million pledged by the Annual Conference in June of 1977.

When Richard E. Matthews was appointed Trustee in the Chapter X proceeding on December 9, 1977, he became vested with the title to all the debtor's assets. As Trustee, he had the full responsibility and control of the ongoing operations of Pacific Homes, including any rights or causes of action Pacific Homes may have had against any person or persons, including partnerships, and unincorporated or incorporated entities. So long as Pacific Homes is under the jurisdiction of the Bankruptcy Court and the Court-appointed Trustee in this Chapter X proceeding, the Board of Directors of Pacific Homes, if there be one, and the Annual Conference have no jurisdiction over the current operation of Pacific Homes.

In the Rules of Professional Conduct and the reported cases discussed below, the question of written consent from a former client is necessary should a potential conflict situation arise. Under the facts here present, and from and after December 9,

1977, the Trustee, Mr. Richard E. Matthews, is the only person who could legally give that consent on behalf of Pacific Homes. Pacific Homes was and is a separate legal entity, although it has been known for years as an agency of the Annual Conference. Certainly, the Annual Conference could not give such a consent on behalf of Pacific Homes, and the Board of Directors of Pacific Homes have by their makeup been selected from persons affiliated with the Annual Conference.

In the past, and before this Court, the Musick firm has represented the Annual Conference, Pacific Homes, and PMIF. In 1978, three class action lawsuits were filed in San Diego, two in the Superior Court entitled *Barr, et al. v. United Methodist Church, et al.*, No. 404677; and *Barr, et al. v. State of California*, No. 413987. There was one case filed in the United States District Court for the Southern District of California, *Trigg, et al. v. Pacific Methodist Investment Fund, et al.*, No. 78–198–S. With the filing of this latter case, the Musick firm was removed as counsel for PMIF and was succeeded by the law firm of Hahn, Cazier & Leff. The Hahn firm is now representing PMIF in litigation before this Bankruptcy Court.

Recently, the Trustee, Richard E. Matthews, has undertaken to sell certain properties of this estate. These properties include the facility known as Desert Crest in Phoenix, Arizona, the Sparr Medical facility in Los Angeles, and certain surplus land and buildings at Kingsley Manor in Los Angeles.

A dispute has arisen between the Trustee, Connecticut General Life Insurance Company, PMIF, the Official Residents' Committee, Title Insurance & Trust Company, as Indenture Trustee, and the State of California as to the distribution of the net proceeds of these sales.

A series of hearings in these adversary proceedings have been held on this problem. At the hearing on July 12, 1979, John R. Browning, Esquire, and William McD. Miller III, Esquire, of the Musick firm, were observed seated in the public section of the courtroom during the morning session. At the afternoon session, only Mr. Browning returned. At approximately 3:30 p. m., Mr. John W. Kirkman was called as a witness. Mr. Kirkman is the Treasurer of the Annual Conference and PMIF, and formerly served as Treasurer of Pacific Homes. During the examination of Mr. Kirkman, the proceeding was interrupted by Mr. Browning as reported in the Reporter's Transcript of July 12, 1979, starting on page 159, line 20 through page 160, line 25:

"MR. BROWNING: Your Honor—

THE COURT: You are not this gentleman's attorney.

MR. BROWNING: I am insofar as he is treasurer of Pacific Homes.

MR. NEITER: Could the gentleman identify himself for the record.

MR. BROWNING: I am John Browning of Musick, Peeler and Garrett.

THE COURT: do you have the permission of Mr. Matthews to appear in this matter?

MR. BROWNING: I formally do not.

THE COURT: You were formerly the attorney for the debtor here, weren't you?

MR. BROWNING: I am appearing for one reason.

THE COURT: Your firm was formerly the attorneys for the debtor.

MR. BROWNING: Yes.

THE COURT: There is a matter under submission—

MR. BROWNING: I understand that there is a matter under submission.

THE COURT: The only reason I haven't gotten it out is I haven't had the time and you are going to get me to rule on it now. I am saying if you want to participate—

MR. BROWNING: I want to make an objection on the expansion of this Court to cover matters that are not—

THE COURT: You are out of order. I am disqualifying you from participating in any further matters in this case. I was going to wait until I had the time to write a memorandum and be a gen-

tleman about it, and I thought you would be a gentleman about it and we would do it in a gentlemanly way."

Throughout the Chapter XI proceeding, this Court, on several occasions, raised the question of conflict of interest with the Musick firm. Each time this question was raised, Mr. Castro, Mr. Browning, or Mr. Miller, on behalf of said law firm, denied any conflict.

On April 27, 1978, and June 9, 1978, the Trustee filed two adversary proceedings in this Court to recover certain sums from the Annual Conference. The Musick firm, as counsel for the Annual Conference, challenged the jurisdiction of this Court to hear those matters and opposed the Trustee's requested relief. An appeal is now pending before the United States Court of Appeals for the Ninth Circuit on that issue.

In the matter which is the subject of this Memorandum of Decision, filed on January 10, 1979, the Musick firm has again challenged the jurisdiction of this Court to hear and rule on this matter.

At the time this proceeding was converted from Chapter XI to Chapter X (December 9, 1977), the Musick firm supported the conversion and urged that the motion was made in "good faith" and that Pacific Homes had a reasonable opportunity to reorganize under Chapter X.

In June, 1977, during the Chapter XI proceeding, this Court approved the sale of an office building located at 5250 and 5300 Santa Monica Boulevard, Los Angeles, California. From this sale, approximately $1.5 Million was realized. This fund was placed in a trust account. Shortly after he became Trustee in the Chapter X proceeding, Mr. Matthews filed an appropriate pleading against the lien holders so that these funds could be used to make certain urgently needed and neglected repairs to the several retirement homes and for administrative costs. Among the lien holders claiming these funds was PMIF. The Musick firm, as counsel for PMIF, opposed the plea of the Trustee. The position of the Musick firm was that Pacific Homes did not have a reasonable chance to reorganize. This

Court approved the Trustee's right to use the funds; and the urgent repairs, including substantial roofing jobs at the several homes, were performed, which consumed a substantial part of such funds.

Thus, it can be seen that the Musick firm has already appeared in this proceeding in opposition to the rights of their former client, Pacific Homes. This statement does not include two additional adversary proceedings filed by the Trustee pending before this Court in which the jurisdiction of this Court to act has been challenged by the Musick firm on behalf of the Annual Conference.

The problem of conflict of interest in this matter differs from the usual case of conflict because of the relationship between the Annual Conference and Pacific Homes.

As noted above, the Musick firm, while serving as counsel for the Annual Conference, undertook, at the request of the Annual Conference, to represent Pacific Homes in connection with the financial problems besetting Pacific Homes. The Musick firm did represent Pacific Homes as special counsel from January, 1976, under such an arrangement until January 10, 1977, when the Minutes of the Meeting of the Board of Directors of Pacific Homes of that date disclose that the Musick firm was retained as General Counsel for Pacific Homes and at that meeting Mr. Browning of the Musick firm accepted such an appointment.

There can be no doubt that during the entire time the Musick firm represented Pacific Homes there was a free exchange of information regarding the many problems of Pacific Homes, the Annual Conference, and counsel. By the appointment to the Board of Directors of Pacific Homes, only those persons who were associated with the Annual Conference, the Annual Conference indirectly, if not directly, exercised considerable control of Pacific Homes. Also, the use of employees of the Annual Conference to perform certain functions for Pacific Homes furthered this control. This is particularly true of Mr. Kirkman, who not

only served as Treasurer of the Annual Conference, but was also Treasurer of Pacific Homes and PMIF.

■ The Musick firm apparently does not understand the role of a trustee in a bankruptcy proceeding, because they state that the Trustee is representing the creditors and not Pacific Homes. This is just not true. The Court appointed Mr. Matthews as Trustee on December 9, 1977. As such, he is an officer of this Court and has the duty and responsibility of conducting the ongoing business of Pacific Homes and reports to the Court, and not to some group of creditors. He has in the past, and probably will do so in the future, opposed creditors of this debtor estate where the creditors' demands created problems in the orderly administration of this estate.

■ The Musick firm has challenged the role of the law firm of Stutman, Treister & Glatt as Special Counsel to the Trustee in filing the Motion to Disqualify Counsel (Musick firm). The record is clear, and is acknowledged by the Musick firm, that throughout the Chapter XI proceeding, this Court raised the question of conflict of interest on the part of the Musick firm. The Court believes that this challenge is without merit. Any attorney participating in this proceeding could have brought on such a motion if he had reason to believe that the Musick firm had committed any ethical violations. *Brown & Williamson Tobacco Corp. v. Daniel Intern. Corp.*, 563 F.2d 671 (5th Cir. 1977). Indeed, had the Court so elected, this matter of conflict of interest could have been set for hearing on the Court's own motion. *United States v. Standard Oil Company*, 136 F.Supp. 345, 351, N6 (S.D.N.Y.1955), *Porter v. Huber*, 68 F.Supp. 132 (W.D.Wash.1946).

In the case of *Empire Linotype School v. United States*, 143 F.Supp. 627 (S.D.N.Y. 1956), the Court, on page 631, stated:

"[1, 2] Assuming *arguendo* that the Government had delayed making the motion to disqualify, the Court would not be precluded or estopped from adjudicating the question now before it. The Court's duty and power to regulate the conduct of attorneys practicing before it, in accordance with the Canons, cannot be defeated by the laches of a private party or complainant. Thus, the Court, on its own motion, may disqualify an attorney for violation of the Canons of Ethics." [Emphasis of Court]

The Musick firm seems to place great reliance on the fact that while serving in their dual capacity as counsel for the Annual Conference and Pacific Homes they were not exposed to any confidential information from Pacific Homes that they could now use in their role as counsel for the Annual Conference.

■ The issues before the Court do not rise or fall on the use of confidential information. Rule 5–102 of the Rules of Professional Conduct of the State Bar of California provides as follows:

"Avoiding the Representation of Adverse Interests.

(A) A member of the State Bar shall not accept professional employment without first disclosing his relation, if any, with the adverse party, and his interest, if any, in the subject matter of the employment. A member of the State Bar who accepts employment under this rule shall first obtain the client's written consent to such employment.

(B) A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned."

It will be noted that the element of confidential information is not mentioned.

■ While the test for conflict of interest set forth in the Memorandum of Points and Authorities filed by the Musick firm applies to actions in the state courts, the federal courts are not bound to follow such guidelines. The standards for the Ninth Circuit are clearly set forth in the case of *Cord v. Smith*, 338 F.2d 516 (9th Cir. 1964). At page 524, the Court stated:

"It is quite true that in this diversity action involving a contract presumably made and to be performed in California,

the substantive law of California controls. But we do not think that the rule of *Erie Railroad Co. v. Tompkins*, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, compels the federal courts to permit, in proceedings before those courts, whatever action by an attorney-at-law may be sanctioned by the courts of the state. When an attorney appears before a federal court, he is acting as an officer of that court, and it is that court which must judge his conduct.

■ In our opinion, the rule that an attorney who has represented one party in a transaction may not thereafter represent the other party in an action against his former client, arising out of or closely relating to the transaction, does not depend for its operation upon a subsidiary decision as to whether the attorney would or might be using or misusing confidential information derived from his former client."

■ Reported federal cases have developed general rules to be applied in the determination of conflict of interest problems. The courts have held that a party seeking to disqualify its former counsel from continuing to appear in an adversary proceeding against the former client need to show only (1) the former representation; (2) substantial relation between the subject matter of the former representation and the issues in the later lawsuit; and (3) the later adverse representation. *E. F. Hutton & Company v. Brown*, 305 F.Supp. 371, 394 (S.D.Texas 1969); *Marketti v. Fitzsimmons*, 373 F.Supp. 637, 639 (W.D.Wis.1974); *First Wisconsin Corporation*, 422 F.Supp. 493, 496 (E.D.Wis.1976).

In the case of *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168 (5th Cir. 1979), the Court dealt with a problem similar to the one before this Court. The Court, at page 172, stated:

"The use of the word 'information' in these Ethical Considerations as opposed to 'confidence' or 'secret' is particularly revealing of the drafters' intent to protect all knowledge acquired from a client, since the latter two are defined terms.

Information so acquired is sheltered from use by the attorney against his client by virtue of the existence of the attorney-client relationship. This is true without regard to whether someone else may be privy to it. *NCK Organization v. Bregman*, 542 F.2d 128, 133 (2d Cir. 1976). The obligation of an attorney not to misuse information acquired in the course of representation serves to vindicate the trust and reliance that clients place in their attorneys. A client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the client in the same matter. As the court recognized in *E. F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 395 (S.D.Tex.1969), this would undermine public confidence in the legal system as a means for adjudicating disputes. We recognize that this concern implicates the principle embodied in Canon 9 that attorneys 'should avoid even the appearance of professional impropriety.' ABA Code of Professional Responsibility, Canon 9 (1970). We have said that under this canon there must be a showing of a reasonable possibility that some specifically identifiable impropriety in fact occurred and that the likelihood of public suspicion must be weighed against the interest in retaining counsel of one's choice. *Woods v. Covington County Bank*, 537 F.2d 804, 812–13 (5th Cir. 1976). The conflict of interest is readily apparent here, however, and we think that the balance weighs in favor of disqualification."

■ As noted above, the Trustee has filed two adversary proceedings against the Annual Conference, and the Musick firm is representing the Annual Conference in those matters. The Trustee has not given his written permission to the Musick firm to appear in opposition to their former client, Pacific Homes. Striped of all the technicalities, the problem is simply one of representing an adverse interest to a former client in litigation in which there is a substantial relationship to counsel's prior service as counsel for Pacific Homes.

## CONCLUSION

The facts and authorities set forth above clearly establish that a conflict of interest exists in any adversary proceedings between Pacific Homes as one party and the Annual Conference as the other party. To permit the Musick firm to represent the Annual Conference under such circumstances would be in violation of the Rules of Professional Conduct of the State Bar of California and the long-established practice in the federal courts. Accordingly, the Motion to Disqualify Musick, Peeler & Garrett is granted.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure and Rule 752 of the Rules of Bankruptcy Procedure, the findings of fact and conclusions of law set forth herein are sufficient, and separate Findings of Fact and Conclusions of Law are unnecessary. Special counsel for the Trustee shall prepare and lodge an appropriate order.