**In the Matter of Theodore V. OLSON, Sandra Ann Olson, Debtors.**

**Bankruptcy No. BK82–379.**

United States Bankruptcy Court, D. Nebraska.

June 4, 1982.

William L. Needler, Chicago, Ill., and Frank Heinisch, Geneva, Neb., for debtors.

Jerrold L. Strasheim, Omaha, Neb., Baird, Holm, McEachen, Pederson, Hamann & Strasheim, Omaha, Neb., for O'Neill Production Credit Ass'n.

## MEMORANDUM OF DECISION

RICHARD F. STAGEMAN *, Bankruptcy Judge.

On the 1st day of May 1982, the Debtors' motion to disqualify Jerrold L. Strasheim and the firm of Baird, Holm, McEachen, Pederson, Hamann & Strasheim ("Firm") as counsel for the O'Neill Production Credit Association for conflict of interest came on for hearing. The following parties appeared: the debtor, in person and by counsel, William L. Needler and Frank Heinisch; Jerrold L. Strasheim, pro se and for the Firm.

The matter was submitted on the pleadings and affidavits of the parties.

NOW, being fully advised in the premises and from the evidence adduced, the Court makes and enters the following:

## FINDINGS OF FACT

1. Theodore and Sandra Olson ("Debtors") have been farming in and around Atkinson, Nebraska since 1954. They have extensive holdings in land and equipment.

2. On or about March 1, 1982, the Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code of 1978. The largest creditor is the O'Neill Production Credit Association ("PCA").

3. Other entities in which the Debtors have a significant interest have also filed petitions in bankruptcy. These include Olson Brothers Manufacturing Company (OBMC) and Southwest Farms Inc. ("Southwest"). These entities originally filed under Chapter 11 of the Bankruptcy Code of 1978 but have since converted their actions to Chapter 7 under the Bankruptcy Code.

4. OBMC produced center pivot irrigation systems. It commenced business in 1967. Ted Olson was president and principal stockholder. Southwest was a farming operation in Southern Texas. Ted Olson was also the president and principal stockholder for this entity.

5. OBMC began to experience severe financial problems during 1980 as the general farm economy slipped and interest rates began to rise. The Debtors hired a financial consultant, one Willis Mouttet to assist OBMC through this period.

6. Mouttet represented to the Debtors that he had retained the firm of Marer, Venteicher, Strasheim and Laughlin, P.C., an Omaha Nebraska law firm to be his legal counsel. The affidavit of Virginia Lash casts doubt upon this representation however, since Mouttet was never billed for legal services nor was any payment received from him for services rendered.

7. On or about October 1, 1980, Mouttet advised the Debtors that they needed to consult with a bankruptcy expert. Jerrold Strasheim was recommended and a subsequent appointment was made.

8. Jerrold L. Strasheim is a well recognized and acknowledged expert in the field of bankruptcy. He is a former bankruptcy judge for the District of Nebraska. He is also one of the few bankruptcy experts practicing in the State of Nebraska.

9. Sometime later in October of 1980, Ted Olson, Mouttet, and Strasheim met to

* Sitting by Special Assignment from the Southern District of Iowa.

discuss the financial problems of OBMC and Southwest. The meeting took place in Omaha at the offices of Marer, Venteicher, Strasheim and Laughlin, P. C. Another attorney from this firm, Frank Kulig, joined the meeting in progress. The meeting lasted approximately two hours.

10. The gist of the conversations during this particular meeting is in dispute. The affidavits of Kulig and Strasheim indicate that the discussions were exploratory in nature and concerned the possible representation of OBMC by Strasheim and his firm. The affidavits of Olson and Mouttet suggest that the discussion was very detailed and included information concerning Ted Olson and his farming operation. The court finds that the affidavits of Mouttet and Olson are less than credible and accepts the information found in the Kulig and Strasheim affidavits as accurate. (See ¶ 4, Kulig Affidavit; ¶ 4, Strasheim Affidavit).

11. The court finds inconsistencies in Ted Olson's affidavit. Olson asserts that he discussed the PCA problems with Strasheim. In particular, he stated that his credit line for 1981 had not been renewed. However, his testimony from a hearing held on May 1, 1982, *O'Neill Production Credit Association v. Theodore V. Olson, Sandra Olson and the Official Creditors Committee*, A82–0244, contradicted that statement. (Olson received further loans from the PCA, one in August 1980 and one in April of 1981. See Tr. T. Olson, direct, p. 91).

12. After the meeting in October 1980, one other meeting was held concerning OBMC and Southwest. This meeting took place at a restaurant in Omaha on or about November 26, 1980. Present at that meeting were Strasheim, Mouttet, and Olson. Two others were also at the meeting. Frank Heinisch, an attorney representing Ted Olson, and Max Smothers, a corporate accountant. No other person was present. The meeting lasted approximately one hour.

13. Again, the subject matter of the luncheon conversation is in dispute. The court finds that the conversation was exploratory in nature centering on the representation of OBMC and Southwest by Strasheim.

14. Olson's affidavit concerning this meeting is also filled with inconsistencies. He mentions the November meeting and another meeting which was supposed to have occurred in January of 1981. A named participant was not present at either meeting. (See Affidavit of Albertus Larson). There is confusion as to where the meeting took place. Further, none of the other affidavits mention a meeting in January.

15. The court therefore finds that there were only two meetings which involved Strasheim and Olson. These meetings concerned the financial predicament of OBMC and Southwest. There was no formal agreement between Strasheim and Olson for legal representation of OBMC. Strasheim did not receive any documents relating to or detailing the financial structure or management of either OBMC or Southwest. Further, no fee was charged to Olson, OBMC, or Southwest for any legal services rendered.

16. The only other contacts Strasheim had concerning OBMC and Southwest was after OBMC's Chapter 11 petition had been filed. Mouttet asked him if he was interested in representing OBMC and Southwest. Strasheim declined.

17. An associate of the Venteicher firm, Steven Turner, visited with Frank Heinisch once or twice concerning OBMC and Southwest in December 1980, immediately preceding the filing of the Chapter 11 petition. The conversation concerned OBMC and its principal creditor Wells Fargo Financial Corporation.

18. These are the only contacts Strasheim and the Venteicher firm had with Olson. Strasheim and Turner left Venteicher in September of 1981 and joined the firm of Baird, Holm, McEachen, Pederson, Hamann & Strasheim. The Firm and Strasheim were retained by the PCA to represent them in the Debtors' Chapter 11 reorganization of their farming operation.

## CONCLUSIONS OF LAW

The Debtors have alleged that an attorney-client relationship was established be-

tween Ted Olson and Jerrold Strasheim in the course of their conversations concerning OBMC and Southwest. Further, they allege that confidences adverse to the Debtors were revealed to Strasheim and these confidences can be used against the Debtors in the present case. Based upon these representations, the Debtors are seeking to disqualify Strasheim and the Firm from representing the PCA in this matter due to the alleged conflict of interest. These allegations have been flatly denied by Attorney Strasheim and the Firm.

The issues for this court to decide are two-fold:

1) Whether an attorney-client relationship existed between Olson and Strasheim.

2) Whether, in the event an attorney-client relationship is found, the former representation and the current controversy are substantially related.

■ The burden of proof is on the movant to show by a preponderance of the evidence that an attorney-client relationship existed. Further, the movant must show that the former representation is substantially related to the current case by a preponderance of the evidence. *In re Brown*, 14 B.R. 437 (Bkrtcy.N.D.Ohio 1981); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020 (5th Cir. 1981); *In re Pacific Homes*, 1 B.R. 574 (Bkrtcy.C.D.Cal. 1979); *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602 (8th Cir. 1977); *American Can Co. v. Citrus Feed*, 436 F.2d 1125 (5th Cir. 1971).

■ In weighing a motion to disqualify an attorney in a given controversy, the court must also balance the client's right to freely choose its representation and judicial efficiency against the public's confidence in the attorney-client privilege and the profession's need to preserve the highest ethical standards. *Cossette v. Country Style Donuts*, 647 F.2d 526 (5th Cir. 1981); *Trone v. Smith*, 621 F.2d 994 (9th Cir. 1980); *Fred Weber, Inc., supra.*

With these considerations in mind we turn to the first issue, namely, whether an attorney-client relationship existed between Strasheim and Olson. The Debtors' affida-vits state that such a relationship existed between Olson and Strasheim. Strasheim argues to the contrary.

■ Canon 4 of the Code of Professional Responsibility gives us some direction in determining whether an attorney-client relationship did in fact exist between Strasheim and Olson. Canon 4 provides that a lawyer should preserve the confidences and secrets of his client. This is an exemplary rule dealing with a particular relationship, the lawyer's personal relationships to others. The broad commitment of the lawyer to respect confidences reposed in him is his talisman. *Fred Weber, Inc., supra.*

■ Since the lawyer's relationship with his or her client is a personal one, the rights and duties may not generally be assigned or delegated without the consent of all parties. *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83 (9th Cir. 1976). In fact, the relationship cannot be formed without the consent of the attorney and the individual seeking representation. *In re Yarn Processing, supra; McGlone v. Lacey*, 288 F.Supp. 662 (D.S.Dak.1968).

■ Consequently, the court cannot find an attorney-client representation between Olson and Strasheim or between OBMC and Strasheim based on the intermediary Mouttet. To do so would violate fundamental principles of attorney-client representation. The consent of the parties must be personal and must flow between the particular individuals.

■ However, there are several situations where although there is no formal or express attorney-client relationship, there exists a fiduciary obligation or an implied professional relationship. *Westinghouse Electric Corporation v. Kerr-McGee Corp., Ltd.*, 580 F.2d 1311 (7th Cir. 1978).

The first among these extends to preliminary consultations between an attorney and prospective client. The fiduciary obligation exists whether the consultation results in employment for the attorney or not. See Code of Professional Responsibility, Canon 4, EC 4–1 (1979); *Westinghouse Electric Corporation, supra.*

■ The establishment of an attorney-client relationship is not dependent on the payment of fees or the issuance of a billing. A confidence can be revealed in a brief moment and without the client being charged a nickel. *Westinghouse Electric Corporation, supra; Novo Terapeutisk, Etc. v. Baxter Travenol, Ltd.,* 607 F.2d 186 (7th Cir. 1979); *Lawrence v. Tschisga,* 244 Iowa 386, 57 N.W.2d 46 (1953); 81 Am.Jur.2d *Witness* § 187.

The court holds that on the basis of the foregoing and the facts present in this matter that an attorney-client relationship did exist between Strasheim and OBMC and Southwest. The relationship did not spring into existence when Mouttet represented to Olson that Strasheim would act as counsel for OBMC. The fiduciary obligation began during the first meeting in October of 1980. It was at this exploratory meeting that OBMC through its president, Olson, could have believed that as a prospective client, Strasheim might have an interest in representing the company.

As the court in *Westinghouse Electric Corporation* observed:

The professional relationship for purposes of the privilege of attorney-client communications hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice.

■ Once an attorney-client relationship is found, an irrefutable presumption that confidences were disclosed becomes firmly entrenched. *In re Yarn Processing, supra; Fred Weber, Inc., supra.* This determination does not bar the attorney from participating in another case opposing the former client however. The court moves to the next determination which is whether or not the former representation and current adverse representation are substantially related.

The movant must show that the matters embraced within the pending suit are substantially related to matters where the attorney previously represented the client. *In re Yarn Processing, supra; T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.D.New York 1953); *Trone v. Smith, supra; Cossette v. Country Style Donuts, supra.*

■ In a disqualification case, the focus of the court's attention is on the precise nature of the relationship between the present and former representations. *Duncan, supra.* The rule does not necessarily involve any inquiry into the imponderables involved in the degree of the relationships between the two matters but instead involves a realistic appraisal of the possibility that confidences had been disclosed in the one matter which will be harmful to the client in the other. The substantial relationship test is not a rule of substantive law but a measure of the quantum of evidence required for proof of the existence of the professional obligation. *Novo Terapeutisk, supra; Cossette, supra; Silver City Chrysler Plymouth, Inc. v. Chrysler Motor Corp.,* 518 F.2d 751 (2nd Cir. 1975).

Various courts have provided guides in determining whether two controversies are substantially related. The courts in *Silver City Chrysler* and *T.C. Theatre, supra,* suggested that the trial court consider the following to determine whether two matters are substantially related:

1. The similarities between the two factual situations.

2. The legal questions posed.

3. The nature and extent of the attorney's involvement in the case including the type of work performed and the attorney's possible exposure to the formulation of policy or strategy.

4. The time period within which the actions in issue took place.

5. The existence of common defendants or plaintiffs.

6. The possibility of a taint on the underlying trial due to the attorney's conduct.

■ Using these guides, the court cannot find that Strasheim's representation of OBMC through Ted Olson is substantially related to the current controversy involving Olson's farming operation.

The factual circumstances of the OBMC Chapter 11 and those of the Chapter 11 farming operation are not alike. The only common denominator between the two is the debtor, Ted Olson. The entities do not share the same creditors,** the same financial structuring, the same lending institutions, the same markets, the same marketing strategies or objectives, the same distributors or the same suppliers. While both are part of the agricultural economy of Nebraska, the entities are in two entirely separate fields. OBMC is a manufacturer of sophisticated agricultural irrigation equipment while the farming operation produces raw material to be transformed into some final feed or food product.

Nor are the legal questions posed by each situation similar. Each Chapter 11 filed in bankruptcy obviously shares procedural similarities. But the strategies in designing a plan of reorganization or defending the debtor in adversary proceedings are as unique as the business seeking reorganization. Certainly, OBMC as a corporate entity has a different approach in dealing with its largest creditor, Wells Fargo Financial Corporation than Ted Olson Farms has with PCA. This is evident from the nature of the adversary proceedings already before the court involving the farming operation.

Notwithstanding the above considerations, the pivotal determination in this case is the nature and extent of Attorney Strasheim's involvement in the prior representation. From all of the facts the court can garner, it was at best peripheral. The evidence shows that Strasheim had no more than exploratory meetings with Olson concerning OBMC and Southwest. No legal work, per se, was done for OBMC or Ted Olson; that is, no contracts were written, no leases were read or drafted, nor were any court appearances entered. The evidence indicates that Strasheim was not privy to any policy formulation or strategy regarding OBMC's Chapter 11 or the current Chapter 11.

In connection with the nature and extent of Strasheim's involvement, the timing of events is significant. The meetings concerning OBMC occurred in October and November of 1980. The last contact Strasheim or his Firm had with OBMC or Olson was a December 3, 1980, telephone call from Frank Heinisch to a Strasheim associate, Steven Turner. The conversation concerned OBMC and its largest creditor Wells Fargo Financial Corporation. Seven days later OBMC's Chapter 11 was filed by another attorney not associated with Strasheim. Fifteen months passed before the farming operation petition was filed. If there had been a common plan or strategy to save all of Ted Olson's business interests it is curious that more petitions were not filed simultaneously. This would be especially true if the entities involved had been so intertwined with Ted Olson personally that the farming operation would have been in jeopardy from persistent creditors seeking repayment on OBMC debts.

Other courts have found that where an attorney has not become heavily involved in the facts of a particular matter but has entered briefly and on the periphery for a limited and specific purpose relating solely to legal questions, disqualification is not warranted. *Silver Chrysler Plymouth, supra; Trone v. Smith, supra.* This is precisely the case at hand. Strasheim entered only for a brief period of time as an acknowledged bankruptcy expert. Matters discussed centered around OBMC and not the farming operation.

The court would also point to the wisdom of the 8th Circuit's approach to disqualification questions similar to the one present here. Where, as in Nebraska or Iowa, there are so few experts in a given area of the law like bankruptcy, it is neither surprising nor unexpected that the same lawyer will appear for the plaintiffs and defendants and that a present adverse party may have been on the other side in a prior case. Nor is it unusual for other practitioners to turn to their colleagues from time to time with some thorny question of procedure or interpretation. *Fred Weber, Inc., supra.* With-

** It should be noted that Ted Olson Farms is a customer of OBMC.

out more, disqualification will not be ordered. It is not mechanical. There must be a reasonable possibility some specifically identifiable impropriety occurred to warrant so drastic a remedy. *Cossette, supra.*

Moreover, the court does not find that the appearance of impropriety here is so great as to warrant a disqualification for conflict of interest. Again, the court relies on *Fred Weber, Inc., supra.* The conduct under scrutiny must be evaluated in the "eye of the beholder" context and the lawyer must be disqualified when an actual appearance of evil exists, though there be no proof of actual evil. But an attorney's conduct is not governed by standards which can be imported to the most cynical eyes of the public. There must be a reasonable possibility of a specifically identifiable impropriety. None has been shown in the case here. The charge that there is an appearance of impropriety with no identifiable impropriety to support it, is too slender a reed upon which to rest a disqualification.