Jules BAGDAN, in his capacity as Trustee in Bankruptcy of Southeastern Insurance Group, Plaintiff,

v.

Robert A. BECK, II, et al., Defendants.

Civ. A. No. 89–3389.

United States District Court, D. New Jersey.

Sept. 19, 1991.

---

Theodore L. Abeles, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Newark, N.J.

Matthew P. Boylan, Mary Jo Reich, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for defendants Lampf, Lipkind, Prupis and Petigrow.

Jeffrey A. Bronster, DeCotiis, Philips & Lundsten, Roseland, N.J.

Deborah A. Cohen, Mezey, Mezey & Cohen, Princeton, N.J.

Lynn K. Day, Coral Springs, Fla.

John G. George, Mineo, Booth & George, Fort Lauderdale, Fla.

Stephen E. Lampf, Lampf, Lipkind, Prupis, Petigrow & LaBue, pro se.

William L. Mentlik, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, N.J.

Michael R. O'Donnell, Riker Danzig Scherer Hyland & Perretti, Morristown, N.J.

Paul M. Petigrow, Lampf, Lipkind, Prupis, Petigrow & LaBue, pro se.

Robert Pershes, Pershes & Schwartz, Plantation, Fla.

Ronald M. Prupis, Fisher Island, Fla.

L. Bruce Puffer, Jr., Shanley & Fisher, Morristown, N.J., for defendants Deloitte, Haskins and Sells.

Jeffrey L. Reiner, Meyner & Landis, Newark, N.J.

Michael M. Rosenbaum, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, Short Hills, N.J., for defendants Leonard Belleza, Harry Olstein, William Paulus, Jr. and Ernest J. Sabato.

Carl S. Shible, North Miami Beach, Fla.

Robert B. Smith, Ruden Barnett McCloskey, Miami, Fla.

Byron L. Sparber, Squire, Sanders & Sempsey, pro se.

Jules Rossi, Long Branch, N.J., Jay Starkman, Jane W. Moscowitz, Steel, Hector & Davis, Miami, Fla., for defendant Beck.

## OPINION AND ORDER

RONALD J. HEDGES, United States Magistrate Judge.

## INTRODUCTION

Plaintiff Jules Bagdan has again moved to disqualify the firm of Budd, Larner, Gross, Rosenbaum, Greenberg & Sade and has also moved to disqualify Jeffrey A. Bronster, Esq. I conducted a hearing to resolve issues of fact relevant to the motion. Having considered the competent evidence presented at the hearing, the credibility of the witnesses and the written submissions of the parties, I make the findings of fact and conclusions of law set forth below.

## FINDINGS OF FACT

1. Plaintiff Jules Bagdan ("Bagdan") is the trustee in bankruptcy of Southeastern Insurance Group, Inc. ("SIG").

2. Budd, Larner, Gross, Rosenbaum, Greenberg & Sade ("Budd Larner") represents defendants Leonard Belleza, Harry Olstein, William Paulus, Jr., and Ernest J. Sabato in this civil action. Michael M. Rosenbaum, Esq. ("Rosenbaum"), is, and at all times relevant was, a Budd Larner partner. Martin W. Aron, Esq. ("Aron"), is, and at all times relevant was, a Budd Larner associate.

3. Jeffrey A. Bronster, Esq. ("Bronster"), was, at all times relevant, a Budd Larner associate. Bronster represents defendants William D. Lipkind and Neil Prupis in this action.

4. Defendants Leonard Belleza, William D. Lipkind, Harry Olstein, William Paulus, Jr., Neil L. Prupis and Ernest J. Sabato are former directors of SIG.[1]

5. On or after April 11, 1988 M. Keith Marshall, on behalf of the "Southeastern Insurance Group Stockholders Protective Committee," wrote to "fellow shareholders" of SIG. Marshall asserted that the Board was not acting in the best interests of SIG and, more particularly, that

[a] dominating clique of directors and officers, comprised of Ronald Prupis (now Chief Executive Officer), his brother, Neil Prupis, a New Jersey lawyer, his law partner, William Lipkind, and one of the law firm's clients, Leonard Bellezza, have taken control.

On receipt of this letter, at least some of the Directors became concerned about their possible individual liability. To address this concern, as well as dissension within the Board, Rosenbaum was contacted by Lipkind on or about April 14, 1988. Rosenbaum and Budd Larner were asked to represent both SIG and the Board in response to the Marshall allegations.

6. Prior to or during April 1988 Marshall and Cabot Security Corporation instituted an action against SIG in state court in Florida to secure SIG's shareholder list. Rosenbaum and Budd Larner played a significant role in the defense of this action on behalf of SIG, although they did not enter a formal appearance.

7. On May 13, 1988, the Board met at SIG's headquarters in Florida. Rosenbaum was present, as were Michael Morrissey and Joanne S. Morrissey of Firemark Consultants Inc. ("Firemark"). At this meeting the Board took a number of actions, all of which would lead to a substantial increase in Budd Larner's representation of SIG or the Directors. Among other things, the Board:

   (a) Removed Robert A. Beck, II, as president and as a director;

   (b) Terminated an employment agreement between SIG and Robert A. Beck, II;

   (c) Accepted the resignation of Ronald M. Prupis as an officer, director, and employee;

   (d) Accepted the resignation of Carl B. Shible as an officer and director;

   (e) Elected Leonard Belleza as chairman of the Board and president;

   (f) Accepted the resignation of Neil L. Prupis as general counsel;

---

1. These directors will be referred to either individually or, collectively, as "the Directors." The latter reference is distinct from "the Board," which refers to the *entire* Board of Directors of SIG.

(g) Elected William D. Lipkind as general counsel; and

(h) Directed a review of the legal fees charged to SIG by Lampf, Lipkind, etc.

The Board also confirmed and ratified the retention of Budd Larner to represent SIG as a corporate entity in any litigation between SIG and Marshall and between SIG and Robert A. Beck, II ("Beck").

8. Beck, through a Florida law firm, began to make allegations against SIG and the Board in late May of 1988. Beginning at the time, Rosenbaum and Budd Larner attempted to negotiate a settlement with Beck, although their role diminished for a limited period when Belleza and Beck's father attempted themselves to negotiate a settlement. Rosenbaum was not a "mere conduit" of settlement proposals and counterproposals.

9. On June 15, 1988, the Board met in New Jersey. At that meeting, among other things, Lipkind reported on the status of the matter between Beck and SIG and also reported on "the response of the Corporation to date as directed by Michael Rosenbaum, Esq., Counsel to the Corporation with respect to this matter." At the June 15th meeting Belleza also reported that he had requested the legal fees paid by SIG to Lampf, Lipkind, Prupis and Petigrow during the years 1986 and 1987 be reviewed.[2]

10. In late 1988 or early 1989 a Florida law firm was retained by SIG in connection with the Beck matter. This firm engaged in settlement discussions with Beck's Florida lawyer. However, Rosenbaum continued Budd Larner's involvement with Beck on behalf of both SIG and the Board. It was not until May of 1989, when settlement discussions with Beck finally broke down and Beck instituted suit, that the Florida firm was formally retained to represent SIG while Budd Larner continued to represent those members of the Board who were named as defendants by Beck.

11. In the summer of 1988 Scott Kranz, a former SIG employee, instituted suit against SIG and three members of the Board in Florida. Rosenbaum appeared

pro hac in this action on behalf of the Board members. However, despite this limited representation, he worked closely with the Florida attorney who had entered an appearance on behalf of SIG and, indeed, they jointly represented SIG and the Board members.

12. Also in the summer of 1988 Shible began to make allegation against SIG and the Board. As with the Beck and Kranz litigation, Rosenbaum and Budd Larner came to represent SIG.

13. In September of 1988 Aron made the first of several visits to Florida to review documents and meet with potential witnesses with regard to the Beck and Shible litigation. On September 7, 1988 Aron met with Ron Prupis and the latter's attorney, who alleged that the Board had been aware of mismanagement within SIG and that the Board did nothing to correct this mismanagement.

14. The Board next met on November 2, 1988 in New Jersey. At this meeting the Board indemnified each of its members "for any and all acts taken by them on behalf of the Corporation and each of its subsidiaries, in any capacity whatsoever, from ... May 13, 1988 to the fullest extent permitted by law." The Board also resolved that Rosenbaum be engaged to "investigate and report to the Board of Directors on the allegation made by Ronald M. Prupis."

15. After the November 2nd meeting of the Board Rosenbaum engaged in settlement discussions with Prupis' attorney and investigated Prupis' allegations. At the December 5, 1988 meeting of the Board in New Jersey, Rosenbaum reported that "he had concluded the investigation he was requested to make at the November 2, 1988 Board meeting, and that he had found no evidence of any wrongdoing."

16. In October of 1988 Budd Larner was retained in connection with a proposed private placement. This retention was ratified by the Board at the November 2, 1988 meeting. Thereafter, and continuing into 1989, Budd Larner was also retained with

---

**2.** At this time Lipkind, who was a member of this firm, was SIG's General Counsel.

regard to a proposed conversion of debt to equity and a possible merger of SIG with Midwest Indemnity Corporation. Budd Larner represented both SIG and the Board in connection with these matters, all of which were intended to protect the financial interest of the members of the Board and to continue SIG as a functioning business entity.

17. Budd Larner's representation of SIG and the Board continued into mid–1989. Between April and June of 1989 Rosenbaum dealt with the New Jersey Department of Insurance on behalf of SIG, its Board and its New Jersey subsidiary. During June of 1989 Rosenbaum, again on behalf of both SIG and the Board, dealt with the United States Treasury Department with regard to the latter's withdrawal of Treasury Certificates of Authority from SIG's operating subsidiaries.[3]

18. In July of 1989 Bronster visited SIG's offices in Florida with regard to the Beck and Shible litigation. During that visit Bronster removed at least some of SIG's records from Florida to protect the interests of "the company and its shareholders." Thus, even after Budd Larner had appeared separately for the Board in the Beck litigation, Budd Larner continued to act on behalf of SIG as a corporate entity in defense of substantially related litigation.

19. Budd Larner had, at all times, unlimited access to the employees and records of SIG. At no time did Budd Larner receive information which anyone connected with SIG could have believed would be kept secret from the Board. Nor did Budd Larner withhold any information from the Board.

20. Between April of 1988 and the summer of 1989 Budd Larner's role grew significantly. Rosenbaum and Budd Larner reported their activities to Lipkind. During this time neither Lipkind nor his firm conducted any independent investigation of the various allegations made against SIG and the Board by Beck, Marshall, Prupis or Shible. Whatever Budd Larner did, it did on behalf of *both* the Board and SIG and Rosenbaum became the *de facto* General Counsel of SIG. As Rosenbaum admitted during the hearing, albeit with regard to the proposed private placement, "what was good for the Directors was good for SIG." Transcript of March 1, 1977, p. 77, 1.20 to 1.23.

21. The allegations of mismanagement made by Beck, Marshall, Prupis and Shible are all substantially related within the meaning of RPC 1.9(a)(1) to those made by Bagdan in the civil action *sub judice*.

22. SIG filed a bankruptcy petition in the Southern District of Florida on or about January 5, 1990. SIG is a holding company. Its operating subsidiaries are Southeastern Casualty and Indemnity Insurance Company, Inc., Southeastern Casualty and Indemnity Insurance Company of New Jersey and Southeastern Reinsurance Company, Inc. Southeastern Casualty and Indemnity Insurance Company, Inc. and Southeastern Reinsurance Company, Inc., are both in liquidation in Florida. Southeastern Casualty and Indemnity Insurance Company of New Jersey is in receivership for the purpose of rehabilitation, is under the control of the New Jersey Department of Insurance, and is not writing any new business.[4]

23. SIG no longer exists as a viable business entity. SIG is being liquidated and Bagdan is marshalling SIG's assets for the benefit of creditors. SIG had no offices, directors or employees.

## CONCLUSIONS OF LAW[5]

1. Pursuant to General Rule 6 A, "[t]he Rules of Professional Conduct of the Amer-

---

3. The role of Budd Larner and Rosenbaum varied. In certain instances they furnished legal advise to the entire Board and in other instances to the Directors only. This variation in representation is irrelevant.

4. SIG has other subsidiaries, all of which are inactive.

5. The Directors argue that my ruling on Bagdan's earlier disqualification motion (Letter-Opinion and Order filed Nov. 15, 1990, affirmed by Order filed Jan. 28, 1991) constitutes "the law of the case" and bars the motion *sub judice*. I reject this argument for several reasons. First, renewal of the motion was appropriate to re-

ican Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court ..." The rule in issue is RPC 1.9, which provides as follows:

(a) A lawyer who has represented a client in a matter shall not thereafter:

(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client; or

(2) use information relating to the representation to the disadvantage of the former client except as RPC 1.6 would permit with respect to a client or when the information has become generally known.

(b) The provisions of RPC 1.7(c) are applicable as well to situations covered by this rule.

"The initial question to answer when applying the rule is to determine the identity of the 'former client.'" *McCarthy v. John T. Henderson, Inc.*, 246 N.J.Super. 225, 230, 587 A.2d 280 (App.Div.1991). Before addressing this question, however, I must address the Directors' argument that SIG no longer exists and, therefore, cannot be a "client" protected by RPC 1.9.

■ 2. In *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985), the Supreme Court answered the question "whether the trustee of a corporation in bankruptcy has the power to waive the debtor corporation's attorney-client privilege with respect to communications that took place before the filing of the petition in bankruptcy." 471 U.S. at 345, 105 S.Ct. at 1989. To answer this question the Supreme Court considered "the roles played by the various actors of a corporation in bankruptcy to determine which is most analogous to the role played by the management of a solvent corporation."

471 U.S. at 351, 105 S.Ct. at 1992. The Supreme Court concluded that, "it is clear that the trustee plays the role most closely analogous to that of a solvent corporation's management," 471 U.S. at 353, 105 S.Ct. at 1993, and that the trustee should be vested with control over the corporation's attorney-client privilege. 471 U.S. at 354, 105 S.Ct. at 1993–94.

It must emphasized that *Weintraub* did not address the viability of the attorney-client privilege of a corporation which is in SIG's current condition. However, the following language from *Weintraub* is instructive:

We find no federal interests that would be impaired by the trustee's control of the corporation's attorney-client privilege with respect to prebankruptcy communications. On the other hand, the rule suggested by respondents—that the debtor's directors have this power— would frustrate an important goal of the bankruptcy laws. In seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors. See generally 11 U.S.C. §§ 704(4), 547, 548. It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files. *To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets.* The Code's goal of uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power that might effectively thwart an investigation into their own conduct. [471 U.S. at 353–54, 105 S.Ct. at 1993 (emphasis added)].

solve genuine issues of material fact. Second, decisions of the Appellate Division of the New Jersey Superior Court issued after my ruling

represent "new law" which should be considered with these findings of fact.

This language has led to a split of opinion whether a defunct corporation may be a "client."

In *FDIC v. Berry*, Civ. No. 1–85–62 (E.D.Tenn. June 10, 1985), the United States District Court for the Eastern District of Tennessee, Southern Division, disqualified counsel for former officers and directors of a bank which had been placed into receivership by the FDIC. The attorneys had been retained as special counsel to the board of directors of the bank before it had been placed in receivership. The court rejected the argument of the attorneys that the bank could not be a "client":

> The Gearheiser and Ausley firms attempt to avoid the dictates of Canon 6 by contending that there can be no conflict between their prior representation of the bank and their current representation of the board of directors, since their former client, the bank, has ceased to exist. As Mr. Gearheiser stated in the hearing before Judge Powers, '[W]e say that our duty of loyalty died with the death of the bank.' (Tr. 35). Although the bank has ceased to exists as an ongoing entity, this court holds that for purposes of Canon 6, the receiver (and by extension, any assignee of the receiver) of a failed bank stands in the shoes of the bank as former client and that an attorney for the failed bank may not represent an interest in later litigation adverse to the successors in interest of that failed bank. Although there are no cases directly on point, this court is persuaded by the position taken by the United States Supreme Court in *Commodity Futures Trading Commission v. Weintraub*, [471] U.S. [343], 105 S.Ct. 1986 [85 L.Ed.2d 372] (1985). In that decision the Court held that the trustee of a corporation in bankruptcy has the power to waiver [sic] the corporation's attorney-client privilege with respect to pre-bankruptcy communications. The Court noted that although the privilege belongs to the corporation and is normally exercised by its officers and directors, when control of the corporation passes to new management, the authori-

ty to assert or waive the privilege also passes. The Gearheiser and Ausley firms contend that such a situation is not analogous to this case where the bank is, for all intents and purposes, dead with no hope of resurrection whereas in bankruptcy situations, the trustee is seeking to revive a corporation so that it can continue as a going concern. The court is unpersuaded by this argument. In *Weintraub*, the Supreme Court talked in terms of management of a corporation and this court sees no distinction, for purposes of Canon 6, between a 'management' operating a corporation so that it may continue as a going concern and thus benefit its shareholders and creditors and a 'management' which seeks to operate a corporation by liquidating its assets for the benefit of the shareholders and creditors. [opinion at 4–5] [Appendix Exhibit I page 679].

*Accord FDIC v. Cherry, Bekaert & Holland*, 129 F.R.D. 188, 190–91 (M.D.Fla. 1989); *In re Financial Corp. of America*, 119 B.R. 728, 736–37 (C.D.Cal.1990); *FDIC v. Ellis*, Civ. No. CD–84–PT–2560–M (N.D.Ala. Dec. 23, 1985) (opinion at 2–3) [Appendix pages 671–672.] [6]

In *FDIC v. Amundson*, 682 F.Supp. 981 (D.Minn.1988), the United States District Court for the District of Minnesota denied the motion of plaintiff FDIC, which was the purchaser of assets of a bank which had been determined to be insolvent and closed, to disqualify an attorney from representing a defendant who was a former chairman of the board of director of the bank. Prior to the determination of insolvency and closing of the bank by the Comptroller of the Currency of the United States, the attorney had represented both the bank and its directors. 682 F.Supp. at 983.

The court began its analysis by consideration of both *Ellis* and *Berry*, which led to a discussion of *Weintraub*. In applying *Weintraub* to the facts before it, the court concluded as follows:

> *Weintraub*, however, is not on point with the question presented in this case:

---

6. The *Ellis* opinion is attached hereto. Attached to *Ellis* is the *Berry* opinion.

whether the attorney-client privilege between Ms. Curtin and the failed bank extends to the FDIC. The *Ellis* and *Berry* courts found *Weintraub* to be 'somewhat analogous' to this question and, therefore, permitted the FDIC to assert the attorney-client privilege formerly belonging to the closed bank. *Ellis,* slip op. at 2 [Appendix page 671]; *Berry,* slip op. at 7 [Appendix Exhibit I page 679].

This Court finds the analogy strained. The bankruptcy trustee maintains the pre-existing entity, managing its affairs. The prior management is supplanted and efforts are made to run the existing business entity in a prudent fashion or to systematically wind it down and fairly distribute its assets.

*In the present case, the better analogy shows the FDIC to be a liquidator. A disaster has hit an insured building. The insurance company (the FDIC as receiver) has paid on its policy and sells the disaster site—lock, stock, and barrel—to a liquidator (the FDIC in its corporate capacity). There is no thought or effort to reconstitute the entity or to run it at all. There is only an effort to sift the ashes, selling off what is valuable or collecting on its receivables. This case is part of an effort to collect its receivables.*

In *Weintraub,* the prior management of the bankrupt corporate attempted to assert a modicum of control over its former business by claiming the attorney-client privilege. The attorney-client privilege was used as a prior-management defensive tactic. In this case, the liquidator seeks to use the 'potential' conflict of interest as an offensive tactic. In *Weintraub,* the bankruptcy trustee sought material which was of value to the bankrupt estate. The battle was over control of the extant corporation, in whosever control it lay. Here, the potential conflict of interest assertion is of no value to the FDIC—save and except as a sword to drive into its opponent. The bank is dead. There is no existing—or potential—corporation. That entity is gone and it will not, and cannot, be reconstituted. The FDIC's assertion is a pure substitution of claimed form of function.

For there to be a conflict under Canon 4, FDIC must show that Holmgren's interests are adverse to its own. To belabor the obvious, it must be pointed out that the bank is not a party. The bank no longer exists. It is the FDIC which is the party. [682 F.Supp. at 986–87 (emphasis added)].

*Accord FDIC v. McAtee,* 124 F.R.D. 662, 664 (D.Kan.1988) ("When the entity controlling the privilege no longer exists, the reasoning of *Admundson* [*sic*] should apply").

*Amundson* and *Berry* represent conflicting views on the issue before me. Each relies on *Weintraub* to support its conclusion. However, on the facts before me, I am of the opinion that *Amundson* is better reasoned.

SIG is, for all intent and purposes, "dead." The shell of SIG continues to exists for the sole purpose of marshalling and distributing assets. As the bank was not a party in *Amundson,* the corporation known as SIG is not a party here. Accordingly, RPC 1.9 is inapplicable. *See International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1292 (2d Cir.1975) (corporation defunct as result of merger not a "client").

3. If the above conclusion is correct Bagdan, as the trustee in bankruptcy of SIG, would not be a "former client." Accordingly, neither RPC 1.9(a)(1) nor (2) would apply. *McCarthy v. John P. Henderson, Inc., supra,* 246 N.J.Super. at 230–31, 587 A.2d 280. However, if the conclusion is incorrect Bagdan, as the successor to the rights of SIG, would be a "former client." On the latter assumption I will turn to an analysis of RPC 1.9.

4. RPC 1.9(a)(1) prohibits a lawyer from representing a client "in the same or a substantially related matter" in which the current client's interests are "materially adverse to the interests of the former client." Given the express language of this rule, which is derived at least in part from Canon 4 of the ABA Code of Profes-

sional Responsibility and DR 4–101 and case law which developed thereunder, it is appropriate to use the "substantial relationship" test first articulated by Judge Weinfeld in *T.C. Theatre Corp. v. Warner Brothers Pictures, Inc.*, 113 F.Supp. 265 (S.D.N.Y.1953). This test was restated in *Allegaert v. Perot*, 565 F.2d 246 (2d Cir. 1977), as follows:

> Our rule ... is that an attorney may be disqualified to Canon 4 if he has accepted employment adverse to the interests of a former client on a matter substantially related to the prior litigation. Once the substantial relationship is established, the court need not inquire whether the attorney in fact received confidential information, because the receipt of such information will be presumed.... However, ... before the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he *could* have received information which his former client might reasonably have assumed the attorney would withhold from his present client. [565 F.2d at 250].

*See, e.g., Christensen v. United States District Court*, 844 F.2d 694, 697–98 (9th Cir.1988); *Kempner v. Oppenheimer & Co.*, 662 F.Supp. 1271, 1277 (S.D.N.Y.1987); *Trinity Ambulance Service, Inc. v. G & L Ambulance Services, Inc.*, 578 F.Supp. 1280, 1281–82 (D.Conn.1984). Given my findings of facts that no representative of SIG understood that Budd Larner was keeping secret any information it might acquire during any representation of SIG and that Budd Larner communicated all information to the Board, the substantial relationship test has not been satisfied by Bagdan and RPC 1.9(a)(1) is inapplicable.[7]

■ 5. RPC 1.9(a)(2) prohibits an attorney from using "information relating to the representation" of a former client to that client's disadvantage "except as RPC 1.6 would permit." In *G.F. Industries v. American Brands, Inc.*, 245 N.J.Super. 8, 583 A.2d 765 (App.Div.1990), the court concluded that this rule "does not limit its prohibition to confidential information. It proscribes conduct where a lawyer 'use[s] information relating to the [former] representation to the disadvantage of the former client' and goes well beyond the protection of confidential information." 245 N.J.Super. at 14, 583 A.2d 765. I disagree with this interpretation of RPC 1.9(a)(2).

The use of the phrase "information relating to the representation" in RPC 1.9(a)(2) is instructive, as is that rule's reference to RPC 1.6.

RPC 1.6 deals with confidentiality of information and, specifically, provides that "[a] lawyer shall not reveal information relating to representation of a client...." RPC 1.6(a). I am satisfied that RPC 1.9(a)(2) is intended to prevent a lawyer from using confidential information to the disadvantage of a former client in a matter that does not fall within the scope of RPC 1.9(a)(1). This is consistent with the ethical obligation of a lawyer to preserve confidences "despite the termination of the attorney-client relationship." *State v. Davis*, 116 N.J. 341, 362, 561 A.2d 1082 (1989).

This interpretation of RPC 1.9(a) serves several purposes. First, it keeps confidential information inviolate. Second, it requires the disqualification of an attorney when the substantial relationship test has been met, thus prohibiting a lawyer from "switching sides" in the "same or substantially related matter." Third, when the substantial relationship test has not been met, it nevertheless prohibits an attorney from using confidential information to the disadvantage of a former client.

7. Although the parties have not done so, it is appropriate to make reference to *Marco v. Dulles*, 169 F.Supp. 622 (S.D.N.Y.), *appeal dismissed*, 268 F.2d 192 (2d Cir.1959). In *Marco*, the court stated that, "[w]hile a board of directors in office has access to such [corporate] files and records it by no means can be assumed that the directors know everything in the files and records of the corporation, or if they did that they retained such knowledge. There may well be secrets and confidences in the files of counsel which are in fact wholly unknown to the former directors." 169 F.Supp. at 629. I need not address this proposition since I have found as a matter of fact that there was no assumption that Budd Larner would withhold any information. *See Christensen v. United States District Court, supra*, 844 F.2d at 698–99.

So interpreted, Budd Larner may not be disqualified from its representation of the Directors. At best, Budd Larner would be prohibited from using confidential information of SIG to Bagdan's detriment. However, no such confidential information exists as a matter of fact here. This does not end my analysis, however, given the existence of RPC 1.9(b).

6. RPC 1.9(b) provides that, "[t]he provisions of RPC 1.7(c) are applicable as well to situations covered by this rule." RPC 1.7(c) provides, in pertinent part:

(c) This rule shall not alter the effect of case law or ethics opinions to the effect that:

\* \* \* \* \* \*

(2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

The Supreme Court of New Jersey discussed and interpreted RPC 1.9(b) in *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 536 A.2d 243 (1988). The court stated:

As initially proposed by the American Bar Association, Model Rule 1.9 was a new provision without a counterpart in the Code of Professional Responsibility. *See* ABA Model Rule 1.9 comment, in G. Hazard and W. Hodes, *The Law of Lawyering* 612 (1986); RPC 1.9 comment, 114 *N.J.L.J.*, July 19, 1984, Supp. 4. The situations covered by this Rule previously had been dealt with under Canon 9 of the Code of Professional Responsibility ('A Lawyer Should Avoid Even the Appearance of Impropriety') and DR 9–101 ('Avoiding Even the Appearance of Impropriety'). In its report on the Model Rules this Court's Committee on the Model Rules of Professional Conduct [hereinafter the Debevoise Committee] recommended that this Court adopt the Model Rule with only one suggested change, namely, the current provision in

RPC 1.9(a)(1) that the tainted attorney can subsequently represent an adverse client only 'after full disclosure of the circumstances.' See 112 *N.J.L.J.*, July 28, 1983, Supp. 7. As the Committee noted, the Model Rule was intended to eliminate the 'appearance of impropriety' analysis previously used to resolve these types of cases....

However, this Court added a new paragraph (b) to the Model Rule specifically incorporating the provisions of RPC 1.7(c), *supra* at 211–212, in situations covered by RPC 1.9. Contrary to the recommendation of the Debevoise Committee, this Court added paragraph (c) to the Model Rule 1.7 to preserve in certain instances the 'appearance of impropriety' doctrine. See RPC 1.7 comment, 114 *N.J.L.J.*, July 19, 1984, Supp. 4; 112 *N.J.L.J.*, July 28, 1983, Supp. 6. That doctrine therefore has continuing vitality in this state in situation covered by RPC 1.7, and in those situations covered by other Rules that incorporate RPC 1.7, *e.g.*, RPC 1.9. Thus it is apparent that the 'appearance of impropriety' doctrine is relevant to the determination of whether an attorney has 'represented' a client and is therefore prohibited from subsequently representing a different client with interests that are adverse to those of the first.

The term 'represented' is not defined in RPC 1.9, nor is it defined elsewhere in the Model Rules or in the New Jersey RPCs. *See, e.g.*, 'Terminology,' G. Hazard and W. Hodes, *The Law of Lawyering, supra*, at 580–81. The ABA, in defining the scope of the Model Rules, indicated that

[t]he Rules presuppose a larger legal context shaping the lawyer's role. That context includes court rules and statutes relating to licensure, laws defining specific obligations of lawyers and substantive and procedural law in general....

Furthermore, for purposes of determining the lawyer's authority and responsibility, principles of substantive law external to these Rules determine

whether a client-lawyer relationship exists.

> [G. Hazard and W. Hodes, *The Law of Lawyering, supra,* at 578].

We look then to the 'larger legal context' in our effort to define representation. [109 N.J. at 213–14, 536 A.2d 243].

■ The *Dewey* court rejected a rule of automatic disqualification under RPC 1.9(b). Instead, the Court concluded that the "appearance of impropriety" analysis of RPC 1.7(c) should be applied. Under that standard, disqualification is not required unless "an ordinary knowledgeable citizen acquainted with the facts" could conclude that there was a representation within the scope of RPC 1.9 and that continued representation would pose a "substantial risk of disservice to either the public interest or the interest of one of the clients." RPC 1.7(c)(2). However, "the appearance of impropriety must be something more than a fanciful possibility. It must have reasonable basis." *Dewey v. R.J. Reynolds Tobacco Co., supra,* 109 N.J. at 215–16, 536 A.2d 243 (*quoting Higgins v. Advisory Committee on Professional Ethics,* 73 N.J. 123, 129, 373 A.2d 372 (1977)).[8]

■ Would "an ordinary knowledgeable citizen acquainted with the facts" conclude that the continued representation of the Directors by Budd Larner and Bronster poses a "substantial risk of disservice to either the public interest or the interest of one of the clients?" I believe not.

Bagdan is the successor to the rights of SIG. Bagdan alleges that the Directors mismanaged SIG. Before SIG went into bankruptcy substantially similar (if not identical) allegations were made against the Directors. Beginning in April of 1988 and continuing to the present Budd Larner defended against these allegations on behalf of the Directors although, through 1989, it also represented SIG. Budd Larner had unlimited access to SIG employees and records for the purpose of representing both the Directors and SIG. Given the length of representation of the Directors and the circumstances by which Bagdan came to be a litigant, as well as the significant fact that there were no confidences kept from either the Directors or SIG, disqualification is unwarranted.

Here, it may be that a former client, not an attorney, switched sides. *See Kempner v. Oppenheimer & Co., Inc., supra,* 662 F.Supp. at 1277–78; *Trinity Ambulance Service, Inc. v. G & L Ambulance Services, Inc. supra,* 578 F.Supp. at 1282. Not only is disqualification unwarranted under the "appearance of impropriety" test but disqualification might tend to "exacerbate the existing perception that judicial procedures are slow and overly dependent on technicalities." *Trinity Ambulance Service, Inc. v. G & L Ambulance Services, Inc., supra,* 578 F.Supp. at 1282 (footnote omitted).[9]

## CONCLUSION

For the reasons set forth above the motion to disqualify Budd Larner and Bron-

---

8. In concluding that RPC 1.9(a)(2) was not limited to confidential information, *G.F. Industries* relied in part on *In re Cipriano,* 68 N.J. 398, 346 A.2d 393 (1975). In *Cipriano,* the Supreme Court held that, "[t]o change sides during the struggle, where the subject matter was interrelated with that which the attorney initially handled ... generates a seeming conflict of interest even if no confidential information had been or would be utilized." 68 N.J. at 404, 346 A.2d 393. *Cipriano* is properly analyzed under the "appearance of impropriety standard" of RPC 1.9(b) rather than RPC 1.9(a)(2), which does not require disqualification.

9. After oral argument Bagdan brought to my attention the decision of the Appellate Division in *Bellezza v. Deloitte & Touche,* No. A–2232–90T1F (App.Div. July 24, 1991) (*per curiam*). In *Bellezza* the court disqualified Budd Larner from the representation of SIG shareholders who were not involved in management when, simultaneously, Budd Larner represented three shareholders who were directors of SIG (and who are defendants here). The basis for the disqualification was Budd Larner's failure to secure the appropriate consent to multiple representation required by RPC 1.7(b)(2). *Bellezza* does not compel the disqualification of Budd Larner or Bronster here for two reasons: First, *Bellezza* permitted Budd Larner to continue to represent the shareholder directors. Second, *Bellezza* recognized the conflict of interest between the shareholder directors and the "mere" shareholders, and Bagdan falls within the latter category as one whose interests are adverse to the former.

ster is denied.[10]

SO ORDERED.

## APPENDIX

Civil Action No.: CV84–PT–2560–M

In the United States District Court
for the Northern District of Alabama
Middle Division

Filed Dec. 19, 1985

Entered Dec. 23, 1985

Federal Deposit Insurance Corporation,
in its Corporate Capacity,
Intervenor/Plaintiff,

v.

Watt A. Ellis, et al.

The Home Insurance Company,
Third Party Defendant.

## ORDER

In accordance with a Memorandum Opinion filed contemporaneously herewith, the Motion of Federal Deposit Insurance Corporation to Disqualify Counsel For Defendants Ellis, Dotson, Morgan, Steele, Jordan and Allen, on October 30, 1985, is GRANTED.

DONE and ORDERED this 19 day of December, 1985.

(s)Robert B. Probst
United States District Judge

## MEMORANDUM OPINION

On October 30, 1985, the Federal Deposit Insurance Corporation (F.D.I.C.) filed a Motion to Disqualify Mr. Odom from representing Defendants Ellis, Dotson, Morgan, Steele, Jordan and Allen. F.D.I.C. claims that *Commodity Futures Trading Commission v. Weintraub,* [471] U.S. [343], [105 S.Ct. 1986], 85 L.Ed.2d 372 (1985), gives it standing to move to disqualify Mr. Odom. Mr. Odom, on the other hand, claims that F.D.I.C. lacks standing to make its motion, that F.D.I.C. has waived any objections to Mr. Odom's representation, and that F.D.I.C. has not made the necessary showing to prevail on its motion.

The facts briefly are as follows. Mr. Odom did some work for the Cherokee County Bank involving the Williams Brothers loan and other matters before the Superintendent of the Alabama State Banking Department took possession of the bank on June 5, 1984. F.D.I.C. was appointed receiver of the bank. On June 6, 1984, F.D.I.C., as receiver, sold to F.D.I.C., in its corporate capacity, certain assets, including all rights and claims against any of the bank's directors, officers, or employees for breach of any duties owed to the bank. On October 10, 1984, F.D.I.C., in its corporate capacity, filed its Complaint in Intervention in the Circuit Court of Cherokee County, Alabama against the defendants. The case was subsequently removed to this court.

The first issue that must be considered is whether or not F.D.I.C. has standing to move to disqualify Mr. Odom. F.D.I.C. relies on *Commodity Futures Trading Commission v. Weintraub,* [471] U.S. [343, 105 L.Ed.2d 1986], 85 L.Ed.2d 372 (1985) to support its contention that it has standing to bring this motion. In *Weintraub,* the Supreme Court held that the trustee of a bankrupt corporation has the power to waive the corporation's attorney-client privilege with respect to pre-bankruptcy communications. *Id.* The court noted that although the privilege belongs to the corporation and is normally exercised by its officers and directors, when the *control of the corporation* passes to new management,

---

**10.** Bagdan's motion for the imposition of sanctions on Budd Larner and Bronster is premised on their failure to acknowledge the existence of a conflict and for their continued opposition to the disqualification motion. The denial of the disqualification motion compels the denial of the sanctions motion.

Bagdan has also moved to compel documents to be turned over. Any document in the possession of either Budd Larner or Bronster generated before SIG "changed sides"—when there were no confidences between SIG and the Directors—not yet turned over to Bagdan must be turned over. Any subsequent documents will be considered after the inevitable appeal from this Order is resolved.

the authority to assert or waive the privilege also passes. *Id.* Although *Weintraub* is not directly on point, it is somewhat analogous to this case. It seems clear to this court that F.D.I.C. as receiver of the Cherokee County Bank would be in the same position as the trustee in *Weintraub* and therefore would have standing to seek the disqualification of Mr. Odom.

In this case, however, F.D.I.C., *in its corporate capacity*, is suing as the assignee of rights transferred by F.D.I.C. as receiver. In their brief, the defendants emphasize this distinction and cite several cases that discuss this distinction. *See Federal Deposit Insurance Corporation v. Ashley*, 585 F.2d 157, 159 (6th Cir.1978); *Federal Deposit Insurance Corporation v. Godshall*, 558 F.2d 220, 223 (4th Cir. 1977). The defendants also argue that the rights pertaining to the attorney-client privilege could not be assigned by F.D.I.C. as receiver to F.D.I.C., in its corporate capacity, and cite *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83 (5th Cir. 1976), for this argument. In *Yarn Processing*, the court held that the assignment of a patent does not assign the attorney-client relationship along with it. *Id.* at 90. The defendants also cite *Lowe v. Graves*, 404 So.2d 652, 653 (Ala.1981), for the principle that "only a party who sustains the relation of a client to an attorney, who undertakes to represent conflicting interests, may be entitled to object to such representation for that reason alone."

Despite the defendants' arguments, it is this court's opinion that F.D.I.C., in its corporate capacity, has standing to assert the attorney-client privilege for the purpose of seeking disqualification. Only one case directly on point has come to the court's attention—*Federal Deposit Insurance Corporation v. Berry*, Civil Action No. 1–85–62 (E.D.Tenn. June 3, 1985). In *Berry*, Judge Robert L. Vining, Jr. found that F.D.I.C., *in its corporate capacity*, and as assignee of assets of the United American Bank in Hamilton County, (UABHC), had

standing to seek the disqualification of a law firm that had previously represented UABHC. *Id.* In so finding, Judge Vining stated:

> In *Weintraub*, the Supreme Court talked in terms of management of a corporation and this court sees no distinction, for purposes of Canon 6, between a "management" operating a corporation so that it may continue as a going concern and thus benefit its shareholders and creditors and a "management" which seeks to operate a corporation by liquidating its assets for the benefit of the shareholders and creditors.[1]

In liquidating these assets, it was necessary for F.D.I.C., as receiver, to transfer these assets to F.D.I.C., in its corporate capacity, for the purpose of collection. *See Ashley*, 585 F.2d at 159; *Godshall*, 558 F.2d at 223. Under these circumstances, F.D.I.C., in its corporate capacity, should stand in the shoes of F.D.I.C., as receiver, and therefore should be able to assert or waive the attorney-client privilege. Any other result would hinder F.D.I.C. in its performance of its statutory obligations and allow the former directors and officers of a failed bank to take a position inconsistent with the purpose of the applicable federal statutes. See 12 U.S.C. § 1811, *et seq.* The role of F.D.I.C., in its corporate capacity, is one part of a statutory scheme which provides for the orderly "winding up of the affairs of a bank."

While under the specific provisions of 12 U.S.C. § 1819, a distinction is made between F.D.I.C. as receiver and in its corporate capacity for the purposes of determining the existence or non-existence of federal court jurisdiction, this court perceives no statutory intent to make a similar distinction for all purposes. Section 1823(c)(2)(A)(i) provides for a means whereby F.D.I.C., in its corporate capacity, is authorized to purchase assets and assume liabilities "[i]n order to facilitate ... the sale of assets of [an] insured bank and the assumption of such insured bank's liabilities by an insured institution...." The

---

1. The full opinion is attached hereto.

sale of such assets generally includes claims or potential claims against directors, officers and employees of the bank. While "[t]he division of authority between the F.D.I.C. as receiver and F.D.I.C. as corporate insurer is statutorily mandated...." (*Gunter v. Hutcheson*, 674 F.2d 862, 873–74 (11th Cir.1982)), the statutory scheme also contemplates that, for all practical purposes, the substantial role of the F.D.I.C. as receiver may be short lived. A decision in a matter of this moment, flavored as it is with a substantial public interest, should not be based on a purely technical distinction. There is no good reason why attorneys for closed banks should continue to represent its directors in actions brought by F.D.I.C. in any capacity. The court concludes that F.D.I.C., in its corporate capacity, may assert the attorney-client privilege of the Cherokee County Bank and seek the disqualification of its former attorneys.

The next issue that must be considered is whether F.D.I.C. has waived its right to seek the disqualification of Mr. Odom. The case law on this issue is arguably split. Some cases say that there are some circumstances under which a mere delay in moving to disqualify an attorney will never bar the motion. *See Kevlik v. Goldstein*, 724 F.2d 844 (1st Cir.1984).[2] On the other hand, there are cases that attach more significance to the delay attendant to a disqualification motion. *See Central Milk Producers Cooperative v. Sentry Food Stores, Inc.*, 573 F.2d 988 (8th Cir.1978). Neither the Fifth nor the Eleventh Circuit has clearly addressed the issue.[3]

In *Kevlik*, the plaintiffs waited for a year and a half after filing their complaint before moving to disqualify the defendant's

attorney. *Kevlik*, 724 F.2d at 847. The court held, however, that "the need for upholding high ethical standards in the legal profession far outweighs the problems caused by the delay in filing the disqualification motion." *Id.* at 848. The court also noted that the record showed no "improper motive" on the part of the plaintiffs in making the motion and that the motion was brought prior to trial. *Id.*

In *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 574 (2nd Cir.1973), there was a three year delay in filing the motion to disqualify. The court stated:

Lastly, it is urged that Burlington's motion to disqualify Rabin is barred by the doctrine of laches. This claim too must fail. Since, as we have noted, disqualification is in the public interest, the court cannot act contrary to that interest by permitting a party's delay in moving for disqualification to justify the continuance of a breach of the Code of Professional Responsibility.... Accordingly, "the Court's duty and power to regulate the conduct of attorneys practicing before it, in accordance with the Canons, cannot be defeated by the laches of a private party or complainant.".... Although in an extreme case a party's delay in making a motion for disqualification may be given some weight ... such extenuating circumstances are not present here. The three-year gap between filing of the Emle action in 1968 and Patentex's motion to disqualify Rabin in 1971 is not extraordinary. Moreover, plaintiffs themselves allowed the actions to remain virtually dormant and they have not demonstrated that Patentex's delay has caused them any prejudice. Indeed, whatever delay may have accompanied Patentex's motion to disqualify Mr. Ra-

**2.** *Kevlik* citing *Emle Industries, infra,* attaches significance to the public interest factor. 724 F.2d at 848.

**3.** The court does not necessarily find that there was any inordinate delay by F.D.I.C. in filing the motion. Arguably, there was not. The court has reached its conclusion even assuming that there was some excessive delay. Odom argues that the letter of August 23, 1985 from

Pederson to Quillen, expressly waiving the attorney-client privilege for the purposes of "any issues that arise in the context of the subject litigation" effectively and expressly waived the right to seek disqualification. The court is of the opinion that two different rights are involved and that the waiver of one is not the waiver of the other.

bin has, if anything, worked to its disadvantage and not to that of the plaintiffs.... Laches is an equitable remedy and the court will not bar a claim on that ground where no prejudice has resulted from the delay.

*Id.* at 544 [574].

In *Central Milk,* 573 F.2d at 992, the defendants waited two years before moving to disqualify the plaintiff's law firm. There was also an effort on behalf of the plaintiff's law firm to screen a former Department of Justice attorney from the case. *Id.* This screening procedure had been approved by the defendants. *Id.* Under these circumstances, the court stated:

A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion. This court will not allow a litigant to delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of a case has been completed. Here appellants not only waited more than two years after they knew Futterman has been hired to formally raise the issue, but they specifically approved the arrangement followed by Pressman and Hartunian with respect to screening Futterman from the case. It is not claimed that this arrangement has been violated. In view of these circumstances, we find that appellants have waived their right to object to the hiring of Futterman.

*Id.*

In *Trust Corporation of Montana v. Piper Aircraft Corporation,* 701 F.2d 85, 86 (9th Cir.1983), the plaintiff knew for two years and six months that there was a potential conflict of interest but did not move to disqualify counsel until thirty-three days before trial. The defendant's firm (Jardine Firm) had previously represented Marlin Wagner and had access to Wagner's financial status. *Id.* The plaintiff (Wagner's estate) had the defendant's firm's file on Wagner almost from the beginning of the lawsuit, and told the Jardine firm that he would contact it if there were

any objections to the representation of the defendant. *Id.* at 88. Under these circumstances, the court found disqualification would "cast shadow over the trial," and the delay constituted "a de facto consent to the Jardine's firm's continued representation of Piper and a waiver of its right to object." *Id.*

In *Redd v. Shell Oil Company,* 518 F.2d 311 (10th Cir.1975), the defendant learned of grounds for disqualifying the plaintiff's attorneys in February of 1974 but did not move to disqualify the attorneys until July 12, 1974. The trial was set for July 15, 1974. *Id.* at 312. The court found that this action would cast a shadow over the trial and affirmed the trial court's denial of the defendant's motion. *Id.* at 315–316.

In *Jackson v. J.C. Penney Co., Inc.,* 521 F.Supp. 1032, 1034–1035 (N.D.Ga.1981) the court stated: "A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion.... A litigant may not delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of the case has been completed." *See also Ex parte Taylor Coal Company, Inc.,* 401 So.2d 1, 10 (Ala.1981) (When prejudice is present, laches can be a defense to a motion to disqualify counsel.). As the cases discussed indicate, the issue of waiver is substantially governed by the circumstances of the case. Potential violations of the Code of Professional Responsibility and the public interest are of primary concern. The avoidance of prejudice to a party is a secondary concern.

In this case, the court concludes that F.D.I.C. has not waived its right to seek to disqualify Odom. The courts that have considered the waiver issue balance the equities to determine if a party has waived the right to disqualify an attorney. The equities in this case favor F.D.I.C.

The only prejudice that the defendants have suffered because of F.D.I.C.'s delay in moving to disqualify Odom is that the defendants might have to replace the Odom firm with a new law firm at a later date

than they would have if the motion had been made earlier. Since the trial is three months away, this "new firm" should have ample of time to prepare for trial.[4] The only real prejudice the defendants have suffered by the delay is the prospect of having to pay two legal fees for the services of one. In other words, the defendants may have to pay the new firm to "catch up" with the present status of the Odom firm.[5] This type of prejudice does not outweigh potential violations of the Code of Professional Responsibility where a significant public interest is at stake.

Any present prejudice may be more to the plaintiff than to the defendants. The prejudice to F.D.I.C. in facing an attorney who may have been privy to confidential information is arguably greater than any prejudice defendants may suffer. This is especially true in light of the circumstances of this case. This court is convinced that the delay in moving to disqualify Odom was not for strategic reasons. Although the defendants aptly point out that there was some case law supporting F.D.I.C.'s standing to move to disqualify Odom before *Weintraub*, F.D.I.C. learned some additional facts and *Weintraub* may have solidified its position. Upon learning that it clearly had standing, F.D.I.C. began to more fully investigate to see whether a substantial relationship existed between issues in this case and the matters in which Odom represented the Bank. Although F.D.I.C. spent several months investigating the potential ethical violations in this case, this court is satisfied that F.D.I.C. acted in good faith and was not trying to gain a strategic advantage. It appears that FDIC was trying to make sure that disqualification was necessary before making its motion. This type of attitude is preferable to a "move now, discover later," attitude.

Under these circumstances, this court holds that FDIC did not expressly waive or waive by implication the right to disqualify Odom.

The final issue to be resolved is whether the Odom firm should be disqualified in this case for violating Canon 4 of the Code of Professional Responsibility. The test to be applied is the "substantial relationship" rule. *See In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 89 (5th Cir.1976); *Dodson v. Floyd*, 529 F.Supp. 1056, 1060 (N.D.Ga.1981) "( [W]here an attorney represents a party in a matter in which the adverse party is that attorney's former client, the attorney will be disqualified if the subject matter of the two representations are 'substantially related.' "). The determination of whether a substantial relationship exists, "turns on the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the subsequent matter in which disqualification is sought." *Dodson*, 529 F.Supp. at 1060. In *Yarn Processing*, the court stated that the "substantial relationship" rule:

> rests upon the presumption that confidences potentially damaging to the client have been disclosed to the attorney during the former period of representation. The court may not even inquire as to whether such disclosures were in fact made or whether the attorney in fact is likely to use the damaging disclosures to the detriment of his former client.... The former client is also aided by the presumption that any confidences given to the attorney were shared among the attorney's partners and employees associated with the attorney at that time.... These presumptions would seem necessary to aid the frank exchange between attorney and client by helping to preclude even a possibility that information

**4.** At the time the parties briefed the issue, trial was four months away.

**5.** Defendants will still be represented by Livingston who has been in this case from the outset. The prejudice to the defendants of disqualifying the Odom firm will not be as great as it would be if the defendants' only counsel were being disqualified. The court noted that, in a companion case in which both Odom and Livingston represented these same defendants, Livingston took the lead at trial. The initial decision whether to accept a retainer such as this should primarily be made by the attorney and not the client. The attorney may have a duty to offer to refund duplicative attorney fees or, at least, suggest the possibility to his client(s).

given in confidence by the former client will be used without the client's consent. Public perception of that possibility will tend to undermine public confidence in the legal profession and the judicial process even if the former client is not in fact damaged.

*In re Yarn Processing*, 530 F.2d at 89.

In *Dodson*, Judge Moye states:

> Were an attorney permitted to represent a client whose cause is related and adverse to that of his former client, he would be called upon to decide what is confidential and what is not, and, perhaps, unintentionally to make use of confidential information received from the former client while espousing his cause.... Doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification.

*Dodson*, 529 F.Supp. at 1061. Judge Moye also sets out three levels of inquiry in deciding disqualification motions:

> Initially, the court must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Finally, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client. The Court must place the burden of proving that the present and prior representations are substantially related on the party seeking disqualification and the focus of the Court's inquiry must be on the precise nature of the relationship between the present and former representations.

*Id.*

Upon applying the three levels of *Dodson* to this case, this court concludes that the Odom firm must be disqualified. There is no dispute that Odom represented the Bank prior to June 5, 1984. Nor is there any dispute that Odom was given the Bank's files concerning the Williams loans and advised with it concerning some related matters. Odom admittedly represented the Bank in connection with an F.D.I.C. Notice of Charges and Hearing which resulted in a Stipulation and Consent To The Issuance of An Order to Cease and Desist and the issuance of such an order. The notice included charges of various types totally related to the claims in this case. There are disputes concerning the purpose for giving Odom the Williams file and whether Odom actually reviewed the file and advised the Bank in any way. However, a factual resolution of these disputes is not necessary because the undisputed facts make it reasonable to infer that confidential information was given to Odom. In fact, there is really no doubt that confidential information was given to Odom. Whether or not Odom reviewed the file or would be likely to use this information to the detriment of FDIC is not material. *See In re Yarn Processing*, 530 F.2d at 89. ("The court may not even inquire as to whether such disclosure were in fact made or whether the attorney in fact is likely to use the damaging disclosures to the detriment of his former client.").

There can be no doubt that the Williams file is relevant to the issues in this case since 44% of the FDIC's claim is based on the Williams loans. The court concludes that FDIC has met its burden of proving that Odom's prior and present representations are substantially related. The totality of the court's decision has been affected by a consideration of the considerable public interest involved.[6]

This the 19 day of December, 1985.

(s) ROBERT B. PROPST
United States District Judge

---

6. This court is of the opinion that the representation by former bank attorneys of officers and directors of closed banks in actions adverse to the F.D.I.C. should be examined with a closer scrutiny than is applicable to the usual attorney disqualification motion. Certainly, the examination should be of the highest permissible degree. Perhaps a reasonable argument could be made that the attorney should be disqualified if there is the slightest doubt. This court, however, has not applied such a standard in this case. The court has recognized the significant public interest involved. This court does agree that in close cases, the doubt should be resolved in favor of the client or the client's *alter ego.*

EXHIBIT I

Civil Action No. 1–85–62

In the United States District Court
For the Eastern District of Tennessee
Southern Division

Federal Deposit Insurance
Corporation, Plaintiff,

vs.

James C. Berry, et al., Defendants.

ORDER

This is an action by the FDIC in its corporate capacity against the former officers and directors of United American Bank in Hamilton County ("UABHC"). The FDIC is suing in its capacity as assignee of all claims that the bank has against those former officers and directors. Pending before the court is the plaintiff's motion to disqualify the law firm of Gearheiser, Peters and Horton and the law firm of Ausley, McMullen, McGhee, Carothers and Proctor as counsel for any of the defendants in this action. The court has carefully considered the briefs of counsel, the documentary evidence filed under seal, and the transcript of the hearing on the motion conducted by Magistrate John W. Powers on March 28.

UABHC is one of several city and county banks owned or controlled by Jake Butcher which failed allegedly because of unsound loan practices. Loans made by UABHC during the tenure of the defendants as officers and/or directors are the subject matter of this action. The FDIC is seeking to recover damages incurred because of the uncollectability of certain loan transactions entered into by UABHC from May 1981 until January 1983.

In November and December of 1982, the FDIC conducted simultaneous examinations of several Butcher-affiliated banks resulting in cease and desist orders by FDIC against UABHC, severely restricting the bank's loan making authority. On February 14, 1983, the Tennessee Commissioner of Financial Institutions closed United American Bank of Knoxville, the flagship bank of Jake Butcher. The FDIC was appointed receiver of that bank. Mr. Butcher resigned as chairman of the board of directors of UABHC, and because of the close relationship between Mr. Butcher and the bank's counsel, the board decided independent counsel who had no connection with Mr. Butcher was needed.

On February 21, 1983, the board of directors of United American Bank of Chattanooga[1] adopted a resolution to hire the law firm of Gearheiser, Peters and Horton as special counsel to the board. At that same meeting the board authorized Mr. Duby Ausley of the Ausley firm and Mr. Wayne Peters of the Gearheiser firm to travel to Memphis with other members of the board to discuss confidential bank matters with the FDIC in order to determine what flexibility the bank had concerning loans and future FDIC plans.

At its meeting on February 24, 1983, the board retained Mr. Ausley as special counsel "for the purpose of assisting the Board of Directors in perfecting an orderly transition of ownership of the Bank." Although the minutes reflect that only Mr. Ausley was hired, the briefs of counsel assume that both Mr. Ausley and his law firm were hired, and the court will proceed on that basis. The minutes of the directors' meeting of March 4 reflect the attendance of Mr. Ausley at that meeting by noting, "At this time, Mr. Duby Ausley—counsel to the Chairman of the Board of Directors, joined the meeting at the invitation of the Chairman." Whether Mr. Ausley was serving in a special capacity as counsel to the Chairman of the Board in addition to serving as

---

**1.** United American Bank of Chattanooga is the former name of United American Bank in Hamilton County; for ease of reference, the bank will be referred to throughout this order as UABHC.

special counsel to the board itself or whether the minutes are simply imprecise in their designation of who Mr. Ausley's client was is unclear. The distinction is irrelevant for purposes of this order.

In its meeting on March 18, the board appointed the Gearheiser firm as general counsel to the bank, noting that the board's prior action hired the Gearheiser firm only as counsel to the board and not to the bank itself. At its meeting on April 18, the board adopted the following resolution:

> BE IT RESOLVED that the Board of Directors of United American Bank in Hamilton County give Mr. Wayne Peters of Gearheiser, Peters and Horton, authorization to investigate Bank transactions for the purpose of determining whether there are claims available for the benefit of the Bank under its Fidelity Bond and under its Directors and Officers Liability policy resulting from any acts covered by those policies, and that the investigation be conducted by general counsel for the Bank and the consultant, Mr. Quincy McPherson of the Bank and that general counsel be authorized to retain Mr. Patrick Ardis [of the Wildman, Harrold, Allen, Dixon & McDonnell law firm in Memphis] to give guidance in connection with the investigation of the facts and to review those facts, the liability and bond policies, and to give a report to counsel on potential claims. . . .

Following through on that authorization, Mr. Peters wrote Mr. Ardis on April 20 in part as follows:

> We have be authorized by the Bank to retain you as special counsel to work with us as general counsel for the Bank in investigating the actions of officers and directors of the Bank giving rise to potential claims against one or more of them; to evaluate the prospects of recovery on such claims; to review applicable bonds and liability policies to determine the extent of coverage for such claims; and to provide our firm a written report on such claims and an opinion letter regarding the prospect for recovery of such claims.

> . . . .

> The officers and directors of the Bank have been advised that your duty and loyalty in undertaking this engagement is solely to the Bank and as special counsel you would not be representing the interests of nor have any duty no loyalty with respect to any officer or director of the Bank.

> It is anticipated that the investigation of the facts will be conducted by our firm and personnel of the Bank, with you providing guidance to us, and that your opinions and reports will be submitted to our firm.

At the board's meeting on May 6 Mr. Ardis gave a detailed discussion to the board on the coverage of the fidelity bond insurance and the directors and officers liability policies. The minutes state, "Mr. Ardis did request that the minutes reflect that his loyalty is to the Bank and not to individual officers and directors. Mr. Ardis is to investigate possible claims of the Bank and to report to the Bank's General Counsel." During that meeting Mr. Ardis purposefully excused himself during the discussion of all of the matters preceding and following his presentation.

The minutes of the board's May 10 meeting reflect that the directors noted that "no determination has been made as to whether the Bank has valid claims against certain officers and directors, as the investigation into these matters is currently being conducted by special counsel."

On May 27, 1983, the Tennessee Commissioner of Banking determined that an emergency existed within the meaning of T.C.A. § 45–2–1502(c)(1) and assumed exclusive control and custody of the property and affairs of UABHC. Thereafter the Commissioner, pursuant to T.C.A. § 45–2–802, tendered the appointment as receiver of UABHC to the FDIC, and the FDIC accepted that appointment pursuant to 12 U.S.C. § 1881(e); the FDIC thereafter undertook the duties of receiver of the bank and assumed possession of the assets, property,

and business of UABHC. Subsequent to the closing of UABHC the FDIC as receiver entered into a contract of sale pursuant to which all claims which UABHC could have maintained against, *inter alia,* its officers and/or directors, were sold to the FDIC in its corporate capacity.

It is axiomatic that when a lawyer's representation of a client ceases, the lawyer may not, without the consent of the former client, represent another client in the same or substantially related manner in which the new client's interests are materially adverse to those of the former client. Canon 6 of the ABA Canons of Professional Ethics provides in part:

The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.

More broadly based is Canon 9 of the ABA Model Code of Professional Responsibility which provides, "A lawyer should avoid even the appearance of professional impropriety."

In the instant case it is undisputed that the Gearheiser firm was counsel to the bank as well as being counsel to the board of directors. Whether the Ausley firm owed its duty of loyalty to the board, to the bank, or both is less clear, since the motion hiring the Ausley firm states that such employment is "for the purpose of assisting the Board of Directors in perfecting an orderly transition of ownership of the Bank. Mr. Hall told the Board that this motion is made in the interest of the protection of the depositors and stockholders of the bank...."

The Gearheiser and Ausley firms attempt to avoid the dictates of Canon 6 by contending that there can be no conflict between their prior representation of the bank and their current representation of the board of directors, since their former client, the bank, has ceased to exist. As

Mr. Gearheiser stated in the hearing before Judge Powers, "[W]e say that our duty of loyalty died with the death of the bank." (Tr. 35). Although the bank has ceased to exist as an ongoing entity, this court holds that for purposes of Canon 6, the receiver (and by extension, any assignee of the receiver) of a failed bank stands in the shoes of the bank as former client and that an attorney for the failed bank may not represent an interest in later litigation adverse to the successors in interest of that failed bank. Although there are no cases directly on point, this court is persuaded by the position taken by the United States Supreme Court in *Commodity Futures Trading Commission v. Weintraub,* [471] U.S. [343], 105 S.Ct. 1986 [85 L.Ed.2d 372] (1985). In that decision the Court held that the trustee of a corporation in bankruptcy has the power to waiver the corporation's attorney-client privilege with respect to pre-bankruptcy communications. The Court noted that although the privilege belongs to the corporation and is normally exercised by its officers and directors, when control of the corporation passes to new management, the authority to assert or waive the privilege also passes. The Gearheiser and Ausley firms contend that such a situation is not analogous to this case where the bank is, for all intents and purposes, dead with no hope of resurection whereas in bankruptcy situations, the trustee is seeking to revive a corporation so that it can continue as a going concern. The court is unpersuaded by this argument. In *Weintraub,* the Supreme Court talked in terms of management of a corporation and this court sees no distinction, for purposes of Canon 6, between a "management" operating a corporation so that it may continue as a going concern and thus benefit its shareholders and creditors and a "management" which seeks to operate a corporation by liquidating its assets for the benefit of the shareholders and creditors.

With this holding, it is clear that the Gearheiser and Ausley firms may not represent any of the defendants in this action. Mr. John Morgan, who in conjunction with the Ausley firm represents two of the de-

fendants, recognized this when he stated at the hearing before Judge Powers:

> If the bank had survived, if United Bank of Hamilton County survived, and if that institution, that corporate entity, were now asserting a claim against these directors, I think it would be very clear that these lawyers could not participate. (Tr. 47).

This was also explicitly recognized by Professor Ray Patterson, who was called as an expert witness by the defendants at the hearing before Judge Powers, when he stated:

> If the bank here was still in existence and brought suit against its directors, the lawyer who had represented the bank during the tenure of those directors I think would clearly be disqualified from representing the directors who are being sued by the bank. (Tr. 68).

Furthermore, the manner in which the Gearheiser firm attempted to represent two clients (*viz.*, the bank and its board of directors) who then had potential adverse interests and now have actual adverse interests mandates that it be disqualified in this action. The Gearheiser firm recognized at least as early as February 24, 1983, that the bank could have potential claims against its officers and directors. At that time the firm sent a letter to International Insurance Company, the liability carrier for the officers and directors, putting it on notice that certain "transactions and occurrences could result in losses to the Bank and possible claims against the directors and officers of the United American Bank in Hamilton County. Claims could also follow from potential investigations and actions by the Tennessee Commissioner of Banking, the FDIC, and other regulatory agencies." Indeed, the Gearheiser firm expressly recognized that there was potential for liability of the directors and officers to the bank when Mr. Peters of that firm suggested that the board adopt a resolution giving him authority to investigate bank transactions so that he could determine whether there were claims available for the benefit of the bank under its fidelity bond and under its directors and officers liability policy. The board adopted such a motion at its April 18 meeting and further authorized Mr. Peters to retain Mr. Patrick Ardis of the Wildman, Harold, Allen, Dixon & McDonnell firm to investigate such possible claims.

Upon completing his investigation, Mr. Ardis reported his findings to the board at its May 6 meeting and specifically requested that the minutes reflect that his loyalty was to the bank, not to the individual officers and directors. Mr. Peters did not recognize a loyalty to only one of his two clients. In fact, in his April 20 letter to Mr. Ardis he stated that in conducting his investigation Mr. Ardis would not be representing the interests of nor have any duty or loyalty with respect to any officer or director of the bank but went on to say, "It is anticipated that the investigation of the facts will be conducted by our firm and personnel of the Bank, with you providing guidance to us, and that your opinions and reports will be submitted to our firm." Incredibly, these undertakings placed the Gearheiser firm in the position of investigating one client to see if it had any potential liability as to one of its other clients. Plainly and clearly the Gearheiser firm was never in a position to assess the validity of the bank's claims against its officers and directors because the firm was counsel for those very officers and directors. This is a clear conflict of interest which the legal profession as a whole and this court in particular cannot condone. Even if this court should find that such dual representation did not constitute an actual conflict of interest, this court would certainly find that there was an appearance of impropriety in representing the bank at the same time the firm represented the officers and directors when there was potential, if not actual, conflicting interest between the bank and its officers and directors.

Canon 5 of the ABA Model Code of Professional Responsibility provides, "A lawyer should exercise independent profession-

al judgment on behalf of a client." Ethical Consideration 5–18 provides:

> A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount in his interest and professional judgment should not be influenced by the personal desires of any person or organization.

The court does not know what facts the Gearheiser firm may have learned as a result of Mr. Ardis's investigation of potential claims by the bank against its officers and directors nor what facts the Gearheiser firm may have learned from an independent investigation of such potential claims (which as counsel for the bank it had a duty and responsibility to undertake). However, it is not necessary for this court to determine if confidential matters were learned which could adversely affect the bank's successor in its claims against the officers and directors. "The court will assume that during the course of the former representation, confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained." *T.C. & Theatre Corp. v. Warner Brothers Pictures,* 113 F.Supp. 265, 269 (S.D.N.Y.1953).

Because of the Gearheiser firm's conflict of interest during the time that it purported to represent both the bank and its board of directors and officers and because of the close relationship of the Gearheiser firm and the Ausley firm during the months immediately prior to the closing of UABHC, this court finds that not only should they be disqualified from further representing any defendant in this action but that they should also be prohibited from consulting with any other defense counsel of defendants or from turning over any of their work product to other defense counsel. The court believes that only in this manner can the FDIC as successor to UABHC be protected from the disclosure of any confidences reposed in either the Gearheiser or Ausley firm to persons who might benefit from the disclosure of such confidences. Furthermore, such prohibition is necessary to prohibit any appearance of impropriety which could otherwise exist by allowing a disqualified law firm to pass along information which it received during the time it was representing conflicting and adverse interests to another firm representing one of those clients with conflicting interests.

For the foregoing reasons, the Gearheiser firm and the Ausley firm are disqualified from further representing any defendant in this action and are further prohibited from disclosing any of their work product to present or future counsel for any of these defendants.

SO ORDERED, this 3rd day of June, 1985.

(s) <u>ROBERT L. VINING, Jr.</u>
United States District Judge